■ JUSTIN KAVANAUGH, Also Known as JUSTIN GONZALEZ, et al., Respondents-Appellants, v WILLIAM NUSSBAUM, Defendant, and EROL Y. CAYPINAR et al., Appellants-Respondents.— In a medical malpractice action, the defendants Erol Caypinar, Nareys Suteethorn and Brookhaven Memorial Hospital separately appeal, as limited by their briefs, from so much of an order of the Supreme Court, Suffolk County (Gowan, J.), dated December 10, 1984, as denied their respective motions to set aside the verdict as to liability and the plaintiffs cross-appeal from so much of the same order as set aside the verdict as to damages in the principal sum of $4,340,000 and granted a new trial on the issue of damages only unless the plaintiffs stipulate to accept a reduced verdict in the principal sum of $1,500,000.

Justice Spatt has been substituted for the late Justice Gibbons *(see,* 22 NYCRR 670.2 [c]).

Ordered that the order is modified, on the law, on the facts and as a matter of discretion, by increasing to $2,240,000 the award of damages to the infant plaintiff and $35,000 to the plaintiff Irene Gonzalez to which they may consent by stipulation in lieu of a new trial with respect to damages; as so modified, the order is affirmed insofar as appealed from, with costs to the plaintiffs; the plaintiffs' time to serve and file a stipulation is extended until 20 days after service upon them of a copy of this decision and order with notice of entry.

In this medical malpractice action, damages are sought for injuries allegedly suffered by the infant plaintiff as a result of negligent prenatal care and treatment rendered to the plaintiff mother by the defendants. At the conclusion of the trial, the jury rendered a verdict which was in favor of the infant plaintiff in the sums of $2,500,000 for pain and suffering, $600,000 for future institutional custodial care and $740,000 for impairment of future earning capacity, for a total sum of

$3,840,000. In addition, the jury awarded $500,000 to the plaintiff mother on her derivative claim for loss of services.

The defendants thereafter moved to set aside the verdict. By order dated December 10, 1984, the court rejected the challenges to the jury's verdict on liability and apportionment. However, on the issue of damages, the court set aside the awards for future care and impairment of future earning capacity in their entirety as being without adequate evidentiary support, and the court did likewise with respect to the award for loss of services. In addition, the court reduced the award for pain and suffering to $1,500,000. Thus, the court ordered a new trial on the issue of damages unless the plaintiffs stipulated within a specified time to judgment in favor of the infant plaintiff only in the sum of $1,500,000.

The defendants now appeal from so much of the foregoing order as denied their respective motions, and the plaintiffs cross-appeal from so much of the same order as conditionally set aside the verdict as to damages. Although we agree with the trial court that there is no basis for setting aside the jury's verdict regarding liability, we conclude that the damages, as reduced by the trial court, are inadequate, and we modify the order appealed from accordingly.

Contrary to the assertion of the defendant Caypinar, the plaintiff's mother's obstetrician, the record contains sufficient evidence to establish a prima facie case and to warrant the jury's conclusion that his failure to have timely performed a Cesarean delivery in the face of indications of fetal distress constituted negligence which was a proximate cause of the injuries sustained by the infant plaintiff. Moreover, because the case against the defendant Caypinar was submitted to the jury in the form of a special verdict (see, CPLR 4111) asking the jury's judgment on each of five alleged departures, a preponderance of the evidence supporting any one of those departures will suffice to sustain the verdict even if the jury's finding as to one or more of the others is not similarly supported (see, Sternemann v Langs, 93 AD2d 819).

With respect to the defendant Suteethorn, the emergency room physician, the case was submitted to the jury in the form of a single interrogatory, although the court submitted three possible theories of liability, i.e., negligent performance of a prenatal internal examination of the plaintiff mother; negligent failure to have completely described all pertinent findings of that examination, including a finding of vaginal bleeding, to the physician covering for the defendant Caypi-

nar; and negligent failure to have admitted the plaintiff mother to the hospital. Although the verdict against the defendant Suteethorn cannot stand unless all theories of liability submitted to the jury are sustained by the evidence *(see, Davis v Caldwell,* 54 NY2d 176; *Mertsaris v 73rd Corp.,* 105 AD2d 67, 75), the record contains sufficient credible evidentiary support as to each.

The remaining arguments advanced by the defendant Caypinar may be quickly resolved. The trial court's charge to the jury, including its recitation of the applicable legal principles and its marshaling of the contentions of the respective parties, was in all respects proper *(see, Dunn v Levinson,* 121 AD2d 596, *lv denied* 68 NY2d 612). The interrogatories submitted to the jury were neither confusing nor improper *(see, Schmeider v Montefiore Hosp. & Med. Center,* 122 AD2d 735). Finally, the defendant Caypinar was not deprived of a fair trial by reason of the trial court's participation in the questioning of certain witnesses; such questioning was infrequent and of limited duration and was not done in such a way as to suggest the court's own views *(cf., Lopez v Linden Gen. Hosp.,* 89 AD2d 1010).

Turning next to the remaining contentions of the defendant Suteethorn, we agree with him that certain conduct by the plaintiffs' attorney was improper. In particular, although the court ruled that a certain written statement made by Suteethorn approximately six years earlier on behalf of the defendant hospital was material prepared for litigation and, thus, privileged, counsel for the plaintiffs improperly cross-examined Suteethorn and thereafter commented in his summation about the defendant's failure to have produced the statement at trial, implying that Dr. Suteethorn had willfully concealed material evidence *(see, Berman v Hudson Bergen Trucking Co.,* 96 AD2d 878). Moreover, the plaintiffs' attorney made improper remarks, to which no objection was made, to the effect that certain expert witnesses called by the defendants had been paid to say whatever the defendants wanted them to say *(see, LaRusso v Pollack,* 88 AD2d 584). Although we do not condone the foregoing instances of misconduct, we are satisfied that such conduct, either separately or cumulatively, did not have an effect upon the jury's findings and, therefore, constituted harmless error *(see, Cotter v Mercedes-Benz Manhattan,* 108 AD2d 173, 180).

We now address the plaintiffs' cross appeal from so much of the order as conditionally set aside the jury's award of damages for pain and suffering ($2,500,000), future institutional

custodial care ($600,000), impairment of future earning capacity ($740,000) and loss of services ($500,000), unless the plaintiffs stipulate to accept a reduced award ($1,500,000) in favor of the infant plaintiff for pain and suffering only. The plaintiffs urge that we reinstate the jury's award of damages in its entirety. The defendants Caypinar and Suteethorn concede that the trial court incorrectly allocated the entire reduced award to pain and suffering, but they nevertheless contend that the total reduced award in the principal sum of $1,500,000 represents the maximum fair compensation payable in this case.

Although there is disagreement among the parties regarding the severity and permanency of the infant plaintiff's injuries, the evidence in the record demonstrates that at the time of the trial in 1983, when the infant plaintiff was 8 years old, he had only achieved the physical development of a child 4 to 5 years of age, with a cranial size of a child 2 to 3 years of age. He was mentally retarded, with an I.Q. of between 60 and 65, and he had been subject throughout his life to epileptic seizures, which might continue to occur in the future. In addition, he was hyperactive and suffering from an impairment of motor functions, but his gross motor functions and, to a lesser extent, his fine motor functions might improve with physiotherapy and the passage of time. He was capable of speaking intelligibly and of recognizing certain letters and numbers; he was able to understand simple questions asked of him; and he was able to dress and feed himself and to attend to his own toilet needs. However, his retardation and attendant behavioral problems would not diminish and, therefore, he would be unable to work in other than a structured vocational setting, performing repetitive factory-type tasks, and he would require lifetime supervision, although not necessarily in an institutional setting.

In addition, the plaintiffs adduced testimony from their medical expert that the annual cost of maintaining the infant in a custodial care facility for neurologically impaired persons was, at the time of the trial in 1983, in the range of $20,000 to $22,000, and that the infant plaintiff's life expectancy was 65% to 70% of normal. The plaintiffs' economic expert testified that the projected earnings for a high school graduate entering the labor force at the age of 18 would, over the work-life expectancy of a person having a normal statistical life expectancy, amount to $601,760, plus fringe benefits (including medical benefits and paid leave) of $140,210. Based upon a reduced life expectancy of 65%, meaning a life expectancy of

56 years from birth, the earnings would amount to $424,753 plus fringe benefits of $98,967. With regard to the projected cost of future institutional custodial care, the economist was of the opinion that the cost of such care for a person having a normal statistical life expectancy, beginning at the age of eight, would, if reduced to present value, amount to $1,150,923 or, on the basis of reduced life expectancy, $1,044,020. Of course, these projected figures would be completely inapplicable in the event that the infant plaintiff was to be institutionalized at some later date.

Although the computation of damages in a case such as this "is necessarily speculative and fraught with difficulties" (Snow v State of New York, 98 AD2d 442, 450, affd 64 NY2d 745), it is settled that loss of future earnings of an infant plaintiff is properly compensable (see, Ledogar v Giordano, 122 AD2d 834, 837, appeal withdrawn 68 NY2d 911). In this case, there was evidence in the record, in the form of the testimony of the plaintiffs' economist, that the infant plaintiff, as a high school graduate, would have earned a total of $741,970 in the course of his lifetime, and the defendants adduced no evidence as to what he might have earned over the course of his lifetime in a vocational setting. Thus, the record supports the jury's determination that, by reason of the negligence of the defendants, the infant plaintiff's future earning capacity was impaired to the extent of $740,000 and, therefore, that portion of the verdict must be reinstated.

We conclude, however, that the trial court properly set aside the award of $600,000 for future institutional custodial care. Although the plaintiffs proffered testimony regarding the cost of such care, they simply failed to establish, by a preponderance of the credible evidence, the necessity of such care for the infant plaintiff. Indeed, the plaintiffs' medical expert testified that although institutional facilities were available, the infant plaintiff's disability was much less severe than that of the average person in those facilities, and he could continue to live under the supervision of a parent or relative so long as such a person was available to care for him. Thus, the jury's award for future care is based upon "uninformed speculation" (see, Buggs v Veterans Butter & Egg Co., 120 AD2d 361) and cannot be permitted to stand.

We find that the trial court's reduction of the jury's award for pain and suffering from $2,500,000 to $1,500,000 was proper. There is no question that the evidence supports an award to the infant plaintiff for pain and suffering, particularly in view of his medical history: he was required to

breathe through a tracheotomy tube for the first three years of his life, and he required constant monitoring and care during that time because of recurring breathing difficulties; he suffered from repeated bouts of respiratory illness and was frequently hospitalized. However, there is no evidence that the infant plaintiff will require surgery or constant medical care in the future and, although he may continue to be subject to seizures, he will be under medication to control them. In addition, we note that although there is no evidence that the infant plaintiff is capable of fully appreciating the consequences of his injuries, or that he is presently conscious of pain, an award for pain and suffering may be based upon the effect that the injuries had upon the infant plaintiff's ability to enjoy the normal pursuits and pleasures of life *(see, Ledogar v Giordano, supra,* at 838). On that basis, the jury's award for pain and suffering, as conditionally reduced by the trial court to $1,500,000, constitutes fair compensation for the infant plaintiff's pain and suffering.

Finally, we find that although the jury's award of $500,000 on the plaintiff mother's derivative claim for loss of services was excessive, the trial court erred in setting aside that award in its entirety, and we conclude that an award of $35,000 for loss of services is justified under the circumstances. Bracken, J. P., Niehoff, Kunzeman, and Spatt, JJ., concur.