OPINION OF THE COURT
Kaye, J.
A physician who designates another doctor to "cover” for him, in the circumstances presented, is not liable for the covering doctor’s own negligence in treating the regular physician’s patient.
Plaintiff Justin Kavanaugh was born, in obvious distress, at 4:46 a.m., December 16, 1974, after only 31 weeks’ gestation, weighing about three pounds. His mother, plaintiff Irene Gonzales, had engaged defendant Erol Caypinar, an obstetrician, on December 3, 1974, after Dr. William Nussbaum had for several months failed to diagnose that she was pregnant.[1] Mrs. Gonzales was then 44 years old; the youngest of her three children was more than 20 years old. On her two visits to Dr. Caypinar’s office — December 3 and December 10, 1974— Mrs. Gonzales complained of staining, and had elevated blood pressure.
At about 9:30 p.m., December 15, Mrs. Gonzales began bleeding to such an extent that her husband took her to the emergency room of defendant Brookhaven Hospital. There she was treated by the emergency room physician, defendant Nareys Suteethorn, a hospital employee. Dr. Suteethorn examined Mrs. Gonzales, but testified that he saw no active bleeding. Whether Dr. Suteethorn inserted his finger into Mrs. Gonzales’ cervix, and whether such an examination precipitated hemorrhaging because of an abnormally low placenta (placenta previa), were sharply disputed issues. Dr. Caypinar *543 was at the time attending a meeting at another hospital, and had arranged for Dr. Albin W. Swenson, Jr. (not a defendant) to cover for him. Dr. Suteethorn reported his findings by telephone to Dr. Swenson who told him to send Mrs. Gonzales home and have her contact Dr. Caypinar in the morning.
After returning home, Mrs. Gonzales’ bleeding increased, and at about 2:00 a.m., December 16, she was returned by ambulance to the Brookhaven emergency room, where she was again seen by Dr. Suteethorn, and this time admitted to the hospital. Dr. Caypinar, who was in the delivery room assisting another doctor, ordered a "double set up” to permit either an internal examination of Mrs. Gonzales or a Caesarian section, because he anticipated a potential emergency (possible placenta previa or placenta separation). For an hour or more Dr. Caypinar received reports from the labor room nurses who were monitoring Mrs. Gonzales, and thereafter himself attended her. A loss of the fetal heartbeat was reported beginning about 4:15 a.m., some 31 minutes before Justin’s delivery by Caesarian section. In the delivery room, the infant required resuscitation; his APGAR (a score of zero to 10 assigned to newborns, based on observation) was one at one minute after birth, five at five minutes, and four at 10 minutes. He was transferred to North Shore Hospital, where a tracheotomy was performed to help him breathe. He was tube-fed for about six months, after which he spent some 14 months at Downstate Medical Center. The evidence indicated that Justin suffered permanent debilitating injury, including a reduced ability to become educated, or to care for himself, or to sustain himself economically; he is retarded, has epilepsy (experiencing periodic grand mal seizures) and requires special education and therapy.
A special verdict form, consisting of several questions, was submitted to the jury. The jury found that Dr. Caypinar was culpably negligent in four respects: he failed to ascertain the nature and position of placenta implantation; he failed to use the available diagnostic procedure of sonography; he failed to advise the covering physician as to potential risks; and he failed to render proper care and treatment on December 16, 1974. A single question was submitted embodying three possible theories of liability of Dr. Suteethorn: that he negligently performed a prenatal internal examination of Mrs. Gonzales; that he failed to describe all pertinent findings of that examination, including a finding of vaginal bleeding, to Dr. Swenson; and that he failed to admit Mrs. Gonzales to the hospital *544 on her first visit. The jury answered that question affirmatively.
The jury was further asked whether Dr. Swenson — the covering doctor — himself had failed to care for and treat Mrs. Gonzales in accordance with accepted standards and whether such departure was a proximate cause of Justin’s injuries. It answered yes to both that question and the next: "Under the facts and circumstances of this case, and in accordance with the rules of law as I have charged,[2] do you find that the arrangement between Dr. Caypinar and Dr. Swenson was such as to impute to Dr. Caypinar any causally related acts of negligence on the part of Dr. Swenson?” Having answered both questions affirmatively, the. jury was then asked whether any part of the finding of Dr. Caypinar’s liability was a result of the imputation of negligence on the part of Dr. Swenson and, if so, how much. The jury answered, "Yes. 25%.”
Total damages were fixed at $4,340,000: $2,500,000 for Justin’s pain and suffering; $600,000 as the present value of future expenses for institutional custodial care; $740,000 as the present value of his diminished earning capacity, and $500,000 for Mrs. Gonzales’ lost services. The jury apportioned fault 70% to Dr. Caypinar, 30% to Brookhaven (as Suteethorn’s employer). The court denied defendants’ motions challenging the jury’s findings as to negligence and apportionment, but it reduced the award for pain and suffering to $1,500,000 and it set aside the awards for custodial care, diminished earning capacity and lost services, concluding that there was inadequate evidentiary support for these items of damage. On cross appeals, the Appellate Division sustained the judgment as to liability and the award for pain and suffering, but it restored both the $740,000 award for lost earning capacity and $35,000 of the award for lost services (129 AD2d 559). This court granted defendants’ motions for leave to appeal.
Except as to the imputation to Dr. Caypinar of liability for the negligence of Dr. Swenson, we affirm the Appellate *545 Division order in every respect. In that the parties have devoted a major portion of their argument to the question whether the liability of Drs. Caypinar and Suteethorn was established, we state at the outset that, as to both doctors, the affirmed findings of their own negligence and causation had support in the record, which is the limit of the scope of our review (Humphrey v State of New York, 60 NY2d 742).
Vicarious Liability[3]
Dr. Caypinar, a sole practitioner, and Dr. Swenson both specialized in obstetrics and gynecology on Long Island, but were not partners in the practice of medicine, and did not share office space. Both participated with two colleagues who similarly enjoyed privileges at Brookhaven Hospital in an arrangement whereby each doctor took a turn covering for the other three, so there would be 24-hour-a-day, seven-day-a-week coverage of their patients. Each of the four retained the entire fee from his own patient, whatever service the others might have rendered that patient. The undisputed testimony was that it was common practice in the community for sole practitioners to cover for each other, and that such arrangements were standard practice at the hospital, which required doctors with privileges to be continuously available for emergencies. Pursuant to the covering arrangement, when Mrs. Gonzales arrived at Brookhaven Hospital the night of December 15 and said she was Dr. Caypinar’s patient, the emergency room physician consulted the roster and called Dr. Swenson, who was covering for him.
*546 Both in sending the issue to the jury and in later refusing to set aside the verdict, the trial court concluded — essentially for three reasons — that the relationship or association between Drs. Caypinar and Swenson supported the imposition of vicarious liability. First, even if Drs. Caypinar and Swenson were not partners, employees or employers of each other and shared no fees, the covering arrangement was for their mutual benefit; their arrangement afforded continuous treatment for their patients and enabled them to satisfy what appeared to be the hospital’s requirement for privileges. Second, Mrs. Gonzales had an ongoing relationship with Dr. Caypinar, and had the right to expect satisfactory treatment from him, which included persons to whom he directed her. Third, Mrs. Gonzales had no knowledge of the arrangement and no opportunity to participate in the selection of the covering doctor in any given instance, from which the court concluded that "it would not seem reasonable that she should bear the total responsibility for the no option situation presented to her.”
Liability in negligence generally rests on a defendant’s own fault. Underlying the doctrine of vicarious liability — the imputation of liability to defendant for another person’s fault, based on defendant’s relationship with the wrongdoer — is the notion of control. The person in a position to exercise some general authority or control over the wrongdoer must do so or bear the consequences (Prosser and Keeton, Torts § 69, at 500 [5th ed 1984]). A classic example is liability of ah employer for the acts of its employees within the course of employment, evidencing the public policy foundations of vicarious liability. The risk is allocated to the employer because it is better able than the innocent plaintiff to bear the consequences of employees’ torts, and by the imputation of liability is also encouraged to act carefully in the selection and supervision of its employees. Vicarious liability applies to hospitals and physicians (Bing v Thunig, 2 NY2d 656).[4] Brookhaven Hospital thus unquestionably stands liable for the negligence of its employee Dr. Suteethorn. But Dr. Swenson was not an employee of Dr. Caypinar — indeed, plaintiffs make no such contention — and *547 the imputation of Dr. Swenson’s negligence to him therefore raises different concerns.
The central decision with respect to the vicarious liability of physicians is Graddy v New York Med. Coll. (19 AD2d 426 [Bergan, J.], mot to dismiss appeal denied 13 NY2d 1175). In Graddy the court refused to impute the negligence of the treating physician to the regular physician, although they shared office space, services, equipment and supplies, and even certain fees. As pertinent as the logic and result of the decision is the collection of authorities supporting the conclusion — still valid after 25 years — that "[i]n the absence of some recognized traditional legal relationship such as a partnership, master and servant, or agency, between physicians in the treatment of patients, the imposition of liability on one for the negligence of the other has been largely limited to situations of joint action in diagnosis or treatment or some control of the course of treatment of one by the other.” (Id., at 429.) The court concluded that vicarious liability "ought not be extended to rest on a situation where there is neither a legal nor an actual control of the treating physician by the other physician and the relationship between them upon which responsibility is sought to be imputed turns upon a shared office and an agreement to service each other’s patients for a shared fee.” (Id., at 430.) (See also, Connell v Hayden, 83 AD2d 30, 57-58; Feigelson v Ryan, 108 Misc 2d 192.)
The years since Graddy have seen the development of medical clinics and group practices engendering new questions about imputed liability, but the guiding principle remains unchanged: vicarious liability for medical malpractice generally turns on agency or control in fact, or apparent or ostensible agency (not in issue here) (Hill v St. Clare’s Hosp., 67 NY2d 72, 79; see also, Lanza v Parkeast Hosp., 102 AD2d 741). The requisite showing was not made.
The issue of agency or control in fact necessarily focuses on the relationship between the two doctors, not their relationship with plaintiffs. The trial court, in its charge and its comprehensive posttrial discussion of the issue, sought to determine whether the Caypinar-Swenson relationship was "sufficiently substantial”, whether there was a "sufficient legal relationship or arrangement so as to impose liability on Caypinar”, whether it was "reasonable to consider them to be associated.” That is not the test. No claim is even made that Dr. Caypinar retained Dr. Swenson to act as his agent, in his *548 behalf. Instead, plaintiffs characterize the two doctors as partners or joint venturers. Neither term fits the relationship. By taking turns covering for each other, the doctors did not become partners or even joint venturers, both relationships typified by a sharing of the property and risks of the venture (see, e.g., Matter of Steinbeck v Gerosa, 4 NY2d 302, 317). Nor is this a case of concerted treatment, where the original physician participated in or exercised some degree of control over the acts of the treating physician (Graddy v New York Med. Coll., 19 AD2d 426, supra; Connell v Hayden, 83 AD2d 30, 53, supra). As the court observed in Graddy, what is presented here "is something less, and quite different from, a relationship of master and servant, or agency upon which vicarious liability has thus far rested.” (19 AD2d, at 430, supra.)
The trial court found persuasive, and a point of distinction, that the Caypinar-Swenson relationship was regular and mutually beneficial. But similar elements also existed in Graddy; indeed it is hard to imagine that any physicians would maintain a covering arrangement that did not offer mutual benefit. Still what is missing is some sort of legal or actual authority or control of the treating physician by the regular physician.
The pivotal consideration in extending vicarious liability is one of policy. We recognize that Graddy is distinguishable on its facts, but the policy concerns articulated there are perhaps even more compelling today. There the court wrote that the "implications of such an enlarged liability would tend to discourage a physician from arranging to have another care for his patients on his illness or absence and thus curtail the availability of medical service.” (19 AD2d, at 430, supra.) Covering arrangements were common for sole practitioners in Dr. Caypinar’s community, as they must be generally today; while it is in the nature of the medical profession that a patient’s emergency can arise at any moment, surely no person expects that his or her regular physician will always be there to respond. If liability were now to be imposed vicariously on physicians for the independent negligence of their covering doctors, some would doubtless be discouraged from making arrangements for the continuous care of their patients, but those who chose to or had to — if they are now to be made insurers of their colleagues’ independent acts — would be compelled to insure themselves accordingly. In either event, the public interest would ultimately be disserved.
*549 Nor is the patient — or the public — left at risk by denying vicarious liability in such circumstances. Doctors remain answerable for their own fault in their covering arrangements, as in their treatment of patients (see, Datiz v Shoob, 71 NY2d 867; Ravo v Rogatnick, 70 NY2d 305, 310). They may, for example, be liable to their patients for negligence in their designation of covering doctors, or for their own joint participation with them in diagnosis or treatment or — as in this very case — for failing to advise the covering doctor of potential risks involved. By the same token, covering doctors are independently responsible, as treating physicians, for their negligence.[5] Thus, we decline to enlarge the doctrine of vicarious liability to reach the situation here, and conclude that it was error to do so.
Alleged Errors in Damages
The Appellate Division, in upholding the pain and suffering award, recapitulated this infant’s difficulties and then noted in addition that "although there is no evidence that the infant plaintiff is capable of fully appreciating the consequences of his injuries, or that he is presently conscious of pain, an award for pain and suffering may be based upon the effect that the injuries had upon the infant plaintiff’s ability to enjoy the normal pursuits and pleasures of life.” (129 AD2d 559, 564, supra.) These lines have evoked a torrent of argument on various issues pertaining to the subject of damages for lost enjoyment of life.
The argument is misplaced. Loss of enjoyment of life was not presented to the jury as an element of the infant plaintiff’s damages and is not presented for our review. Nor did the Appellate Division predicate its affirmance on that new theory. The additional reference in the Appellate Division memorandum was at most a makeweight supporting the conclusion that the evidence amply supports the award of $1,500,000 for pain and suffering on the basis charged to the jury. We have no basis for disturbing that conclusion. Similarly, we affirm the Appellate Division order restoring the award for impaired *550 earning capacity. Defendants acknowledge that some amount might be appropriate, but urge that this award is excessive. Defendants’ contention that the evidence supporting the award for impaired earning capacity must be rejected as "bloated” and incredible as a matter of law is without merit, as is their contention that the charge (which must be considered in its entirety) was misleading.
Disposition
Having concluded that the only error committed by the Appellate Division was in upholding the imposition of vicarious liability on Dr. Caypinar, we next consider what relief is necessary to remedy that error.
The jury’s finding of negligence on the part of Dr. Swenson, for which it imposed liability on Dr. Caypinar, was only one of five grounds found against Dr. Caypinar. Our rejection of vicarious liability does not undermine the validity of the remaining incidents of negligence, which independently support his liability to plaintiffs. Thus, despite error in imposing vicarious liability, Dr. Caypinar remains jointly and severally liable with Brookhaven for the full amount of the verdict as modified by the Appellate Division, and plaintiffs may recover the whole of their damages from either defendant. As we have several times noted, plaintiffs are not obliged to include all joint tort-feasors as defendants, and they may recover their entire damages from any of the particular tort-feasors sued, regardless of the concurrent negligence of others (see, Ravo v Ragotnick, 70 NY2d 305, 313, supra; Graphic Arts Mut. Ins. Co. v Bakers Mut. Ins. Co., 45 NY2d 551, 557; Kelly v Long Is. Light. Co., 31 NY2d 25, 30).
While our decision to reject vicarious liability in the circumstances is without practical significance to plaintiffs, it may well affect defendants’ obligations as between each other. By overturning the finding against Dr. Caypinar for Dr. Swenson’s negligence, we also of necessity set aside the apportionment of damages between the two defendants, because the jury may well have predicated the apportionment on its belief that Dr. Caypinar’s share included responsibility for Dr. Swenson’s negligence. How the jury would have apportioned fault between the two codefendants without the element of vicarious liability is a question we cannot answer. Therefore, while not disturbing the award to plaintiffs, we must remit the case to Supreme Court, Suffolk County, for a new apportionment of *551 damages between defendants, without the imposition on Dr. Caypinar of vicarious liability for the negligence of Dr. Swenson.
Defendants’ remaining points are without merit or unpreserved.
Accordingly, the order of the Appellate Division should be modified, without costs, in accordance with the writing herein and, as so modified, affirmed, with costs to plaintiffs against appellants.
Chief Judge Wachtler and Judges Simons, Alexander, Hancock, Jr., Bellacosa and Dillon* concur.
Order modified, without costs, and case remitted to Supreme Court, Suffolk County, for a new apportionment of damages in accordance with the opinion herein and, as so modified, affirmed, with costs to plaintiffs against appellants.

. A verdict was directed in Dr. Nussbaum’s favor at the close of the evidence; he is not a party to this appeal.

2. The court charged that liability for Dr. Swenson’s negligence could be imputed to Dr. Caypinar if it found a "sufficient legal relationship or arrangement”, considering the following factors: any fee arrangement; any mutual benefit; whether the hospital required the arrangement; whether Mrs. Gonzales had the opportunity to select who would treat her in Dr. Caypinar’s absence; whether Dr. Caypinar advised her she would be treated by someone else if he was unavailable; and whether Dr. Caypinar advised her of the names and qualifications of the covering doctors.

. [3] As the Appellate Division noted, the case against defendant Caypinar was submitted in the form of a special verdict, seeking the jury’s judgment as to five separate departures causing plaintiffs’ injuries, and a preponderance of the evidence as to any one is sufficient to sustain the verdict (129 AD2d 559, 560; see also, Sternemann v Langs, 93 AD2d 819). By contrast, the single interrogatory submitted as to Dr. Suteethorn encompassed three possible theories of liability, and cannot stand unless all three are sustained (see, Davis v Caldwell, 54 NY2d 176). The special verdicts would be an impediment to review if indeed the separate questions were the basis for Dr. Caypinar’s liability. However, the jury also determined that Dr. Swenson was himself culpably negligent in treating Mrs. Gonzales, that Dr. Caypinar was liable for Dr. Swenson’s negligence,“and that this liability accounted for 25% of the total negligence found against Dr. Caypinar. In light of these findings, it is not possible to conclude (as it was in Sternemann) that the jury verdict can stand on any of the other, sustained grounds found against the doctor. Vicarious liability having been isolated as the basis for a portion of the award against Dr. Caypinar, that issue is appropriately before us.

. See, e.g., Business Corporation Law § 1505 (a), providing that each "shareholder, employee or agent of a professional service corporation shall be personally and fully liable and accountable for any negligent or wrongful act or misconduct committed by him or by any person under his direct supervision and control while rendering professional services on behalf of such corporation.”

. It bears note that, in deciding the legal issue, we do not condone a practice where a physician does not tell the patient what, if any, covering arrangements have been made. The regrettable fact that Dr. Caypinar did not mention the covering arrangements to Mrs. Gonzales cannot, however, make him vicariously liable for the independent negligence of the other physicians participating in the arrangements.

 Designated pursuant to NY Constitution, article VI, § 2.