■ ENZA D. S. ZIMMERMAN, Individually and as Mother and Natural Guardian of DESHAWN T. ZIMMERMAN, et al., Appellants, v JAMAICA HOSPITAL, INC., Respondent, et al., Defendants.—In a medical malpractice action to recover damages for personal injuries, etc., the plaintiffs appeal, as limited by their brief, from so much of a judgment of the Supreme Court, Queens County (Rosenzweig, J.), entered May 19, 1986, as, upon a jury verdict, is in favor of the defendant Jamaica Hospital, Inc., and against them.

Ordered that the judgment is affirmed insofar as appealed from, with costs.

We find unpersuasive the plaintiffs' contention that the interrogatories submitted to the jury myopically focused the attention of the jurors upon the alleged failure of the defendant hospital to record the infant plaintiff's vital signs and to monitor his blood gases to the exclusion of the plaintiffs' theory that the infant's condition was the result of oxygen deprivation after birth (i.e., perinatal hypoxia). Viewed in the context of the evidence adduced at trial and the court's jury instructions, the challenged interrogatories were neither confusing nor misleading (see, e.g., Kavanaugh v Nussbaum, 129 AD2d 559; Schmeider v Montefiore Hosp. & Med. Center, 122 AD2d 735, lv denied 69 NY2d 605).

Although the trial was lengthy and included extensive expert testimony on behalf of the numerous parties, the only alleged instances of malpractice presented by the plaintiffs at trial with respect to the defendant hospital consisted of the claims that the nursing staff departed from accepted medical standards in failing to properly record the infant plaintiff's vital signs and in neglecting to monitor his blood gases. Consequently, under the plaintiffs' theory, the purported fact that the infant plaintiff suffered from hypoxia was neither detected nor treated through the administration of oxygen, thereby resulting in severe brain damage. In four separate interrogatories, the jurors were asked to determine whether the failure to record vital signs or to monitor blood gases constituted departures from accepted medical practice, and if such departures were a proximate cause of the infant plaintiff's injuries. The trial court, in its charge to the jury, painstakingly delineated the proper approach the jurors were to take with the interrogatories as to each of the defendants. Most significantly, the court instructed the jury that if they found that the defendant hospital's failure to record the infant plaintiff's vital signs constituted a departure from accepted medical standards, they were then required to consider whether that departure constituted a proximate cause of "the hypoxia which the child suffered if you find that he suffered hypoxia". With regard to the alleged negligence in failing to monitor blood gases, the court further instructed the jurors "to consider * * * not in a vacuum but in line of all the evidence you heard in the case as to whether if there was hypoxia it would have been detected and proper treatment changed by arterial blood gases". Finally, the court further explained the interrogatories and the manner within which to

evaluate the evidence by reminding the jurors that "it is the contention of the plaintiff that the evidence in his case indicates that the plaintiff, Deshawn Zimmerman suffered from perinatal hypoxia due to the negligence of the [h]ospital * * * in not ordering arterial blood gases and then providing such oxygen to the plaintiff so that he would not suffer brain damage during the perinatal period". In view of the trial court's thorough and detailed instructions, it cannot be said that the form of the written interrogatories submitted to the jury was misleading (see, e.g., Schoch v Dougherty, 122 AD2d 467, 469, lv denied 69 NY2d 605). The mere fact that the interrogatories might have been more appropriately phrased does not warrant a new trial where, as here, there is ample evidentiary support for the verdict in favor of the defendant hospital and there is no significant probability that the form of the interrogatories influenced the verdict (see, e.g., Schmeider v Montefiore Hosp. & Med. Center, supra; cf., Caputo v Frankel, 89 AD2d 595).

Furthermore, contrary to the plaintiffs' contentions, the court's charge was clear and detailed, and nothing contained therein warrants reversal in the exercise of this court's discretion (cf., Pfeffer v Maimonides Med. Center, 95 AD2d 850; Caputo v Frankel, supra). The trial court adequately set forth the contentions of the respective parties (see, e.g., De Luca v Kameros, 130 AD2d 705) with the end result that the charge was far more comprehensible than it would have been had the court attempted to marshal the extensive and complex medical testimony (see, Kavanaugh v Nussbaum, supra).

Moreover, we discern no violation of any recognized legal or ethical proscription occasioned by the testimony of Dr. Rueben, a hospital physician who treated the infant plaintiff prior to the commencement of the action. The trial court properly determined that the rule announced in Anker v Brodnitz (98 Misc 2d 148, affd 73 AD2d 589, lv dismissed 51 NY2d 703, 743) did not bar Dr. Rueben from testifying. That decision precludes an opponent's use of unauthorized private interviews with treating physicians during the pretrial discovery phase of a medical malpractice action absent the patient's express consent or a court order. The rationale underlying this rule recognizes the sanctity of the physician-patient privilege during the discovery phase of a malpractice action (see, CPLR 4504). The instant record contains no evidence that any of the defendants conducted such prohibited interviews with Dr. Rueben. Additionally, the plaintiffs clearly waived the physician-patient privilege regarding all aspects of the infant

plaintiff's medical condition, which were placed in issue at trial *(see, e.g., Livreri v Whitehead,* 122 AD2d 838). Indeed, Dr. Rueben was not called to testify until after the plaintiffs had rested their case and "fully bared [the infant plaintiff's] medical condition" *(Livreri v Whitehead, supra,* at 839). Furthermore, the medical records utilized by Dr. Rueben to illustrate the basis for his opinions were clearly not confidential, as the plaintiffs had introduced these records into evidence and used them in examining other witnesses during the presentation of their case.

Likewise, Dr. Rueben's testimony did not violate CPLR 3121 (b) or any of the present or former rules of this court regarding disclosure of medical reports. CPLR 3121 (b) governs only the exchange of medical reports compiled by physicians who examine an injured party in preparation for litigation *(see, Hoenig v Westphal,* 52 NY2d 605; *Pierson v Yourish,* 122 AD2d 202). Dr. Rueben prepared no medical reports in contemplation of litigation. Rather, he was an attending physician who treated the infant plaintiff and who merely made notations in hospital records which were available to the plaintiffs well in advance of his testimony. In any event, the trial court safeguarded the plaintiffs from any potential unfair prejudice by expressly limiting the scope of Dr. Rueben's testimony to those matters set forth in the aforementioned hospital records. Nor did Dr. Rueben violate the prohibitions against unprofessional conduct embodied in 8 NYCRR 29.1 (b) (8) by testifying pursuant to a subpoena in the present action.

Similarly unavailing is the plaintiffs' contention that Dr. Rueben "sabotage[d]" their case by altering his pretrial diagnosis of the infant plaintiff when called to testify on behalf of the defense. A thorough review of the record demonstrates that at no time prior to the commencement of the action did Dr. Rueben support the plaintiffs' theory that the infant plaintiff suffered perinatal anoxia. The hospital records placed in evidence reveal that on July 17, 1976, Dr. Rueben tentatively diagnosed the infant plaintiff as suffering from severe diffuse cerebral disease of prenatal origin. Following his examination of the patient one year later, Dr. Rueben noted that the infant plaintiff suffered from a severe chronic brain disorder of an undetermined, but most likely prenatal origin, with retardation, seizures, myoclonic spasms and hypsarrhythmia. Hence, his pretrial opinion was entirely consistent with his opinion expressed at trial that the infant plaintiff's condition was of prenatal rather than perinatal origin.

We have considered the plaintiffs' remaining contentions

and find them to be without merit. Mollen, P. J., Mangano, Rubin and Sullivan, JJ., concur.