[671 NYS2d 727]

Susan Bermeo, an Infant, by Her Father and Natural Guardian, Mario Bermeo, et al., Appellants, v Yucel Atakent et al., Defendants, and New York City Health and Hospitals Corporation, Respondent.

First Department, April 23, 1998

### APPEARANCES OF COUNSEL

*Mark Kressner* of counsel, Bronx (*B. Jennifer Jaffee* on the brief; *Belovin & Franzblau,* attorneys), for appellants.

*Kathleen Alberton* of counsel, New York City (*Larry A. Sonnenshein* and *Fay Leoussis* on the brief; *Michael D. Hess, Corporation Counsel* of New York City, attorney), for respondent.

### OPINION OF THE COURT

Tom, J.

Plaintiffs appeal from an order of the trial court that set aside a jury verdict of $45,295,573 and reduced the award to a lump sum of $4.5 million on the grounds that the court erroneously reduced the damage portion of the award and failed to structure the award in compliance with CPLR article 50-B.

This personal injury action was commenced to recover damages for injuries sustained by the infant plaintiff (Susan Bermeo) while in the care of the prenatal intensive care unit of defendant New York City Health and Hospitals Corporation (HHC). Plaintiff, who was born premature, suffered hypoxic brain damage when an ambu-bag used to administer oxygen to her malfunctioned, depriving her of oxygen, resulting in cerebral palsy and consequential physical and mental handicaps. Her identical twin was not injured. At trial, defendant HHC conceded negligence and liability. The sole issue raised on appeal is the propriety of the award of damages.

Plaintiff, who was 16 years old at the time of trial, was living with her father and stepmother. The medical evidence revealed that she suffered significant physical and mental defects and developmental delays. Plaintiff suffers from the "spastic" type of cerebral palsy, which is not painful as pain is generally understood. However, a sufferer such as plaintiff will have cramping, discomfort, and collateral pain resulting from surgery, adjustments to special equipment and the like. Medical evidence suggests that plaintiff's cognitive shortcomings arise from damage to the information-processing part of the brain. These defects have a severe impact on plaintiff's potential for employment as well as plaintiff's ability to care for herself.

Unrebutted evidence establishes infant plaintiff's injuries, which include: deformities of the legs and feet that impeded her ambulatory activities; the use of bars strapped to her as an infant to correct the turning of her legs, eventually replaced by leg braces; her admission as an in-patient for 28 months—with a consequential deprivation of emotional connectedness with parents and resulting episodes of depression—and three subsequent in-patient admissions; her confinement to a wheelchair as an infant; orthopedic surgery at the age of four (to allow her to crawl), and several subsequent surgeries and years of physical therapy to increase her ambulatory abilities; two surgeries for crossed eyes; two 1983 leg muscle surgeries; in-patient rehabilitation for two months in 1984; and psychological effects resulting from her parents' 1984 divorce, for which she blamed herself, and chronic fear as she grew larger and still could not walk that her mother might leave her. She underwent further surgeries in 1988 and 1989, then again in 1991. By 1991, she was able to walk limited distances, with difficulty, with leg braces and crutches. For a year following the 1991 surgery, she resided away from her family in a rehabilitation center, but medical evidence indicated that she did not progress well with her ambulatory functions. She can navigate short distances at home, with crutches and a brace, but will always require a wheelchair out of home. The Chief of the Cerebral Palsy Service Clinic at the Hospital for Special Surgery testified that he did not foresee the need for further surgery for plaintiff. Plaintiff also had chronic urinary tract malfunctions as a child, which caused her to wet herself constantly, though HHC points out the problem has been controlled through medication.

Plaintiff, who has a borderline IQ ranging from 78 to 81, has learning disabilities, including special problems with word rec-

ognition, spelling and arithmetic. She also has poor visual perceptual motor integration, which restricts her reading ability though her abilities to evaluate pictures and communicate orally may be better.

Plaintiff started school in the special education program in the fourth grade and was later temporarily placed in the "mainstream population" until it interfered with therapy and remedial tutoring scheduling. She achieved good grades but therapy interfered with her school attendance. She remains learning disabled, but has some cognitive abilities. She helps around the household by setting the table but requires assistance with all daily activities and personal needs such as getting dressed and combing her hair. Plaintiff's expert in pediatrics testified that plaintiff can travel on City buses that accommodate the disabled or might even be able to drive herself in a modified automobile. However, she will require help getting to and from, and into and out of, a vehicle, which also impacts on her lifestyle as well as her employment opportunities. The expert also testified that plaintiff would need to either live in a group home or have a home attendant. Physical therapy to maintain muscular developments and occupational therapy will continue, twice weekly, until she is 21 years of age, and once weekly for the rest of her life.

Plaintiff's medical expert testified that plaintiff likely would not be commercially employable. Although he conceded on cross-examination that it would not be impossible for her to be commercially employed, he believed that it was not reasonable to believe that she could be so employed. Plaintiff's economist arrived at his calculations after adopting the physician's assumption that the infant plaintiff was commercially unemployable.

In contrast to plaintiff's evidence, both of defendant's experts in pediatric neurology testified that the infant plaintiff would not have to live in a group home since she is within normal intelligence and has some ability to ambulate. They believed that she could live in housing adapted for the handicapped and have an attendant come in for an hour in the morning and evening to assist her with her personal needs. In their opinion, plaintiff could have gainful employment.

After trial, the jury awarded plaintiff $45,295,573 in damages. Specifically, the award consisted of $1,600,000 for 16 years of the child's past pain and suffering, $7,875,000 for 63 years of future pain and suffering, $4,070,573 for 29.8 years of loss of earning capacity, $252,000 for future physician's ser-

vices and medical equipment, $472,000 for future physical and occupational therapy and $31,026,000 for future group home or home care expenses, all for 63 years.

The Supreme Court granted defendant's motion to set aside the verdict as excessive to the extent of ordering a new trial on damages, unless plaintiffs consented to accept the sum of $4.5 million. Without trivializing the infant plaintiff's injuries, the court noted that her condition most affects her legs but that she is not in pain. Moreover, she goes to school, was able to testify in court, can walk short distances with a brace and a crutch and will be able to drive an automobile. The court also found that she can hold a job and possibly earn a salary. The court further characterized its order as a settlement and held that the award did not have to be structured since it was not subject to CPLR article 50-B.

While we reject the unitemized, sum reduction devised by the trial court, we, nevertheless, would reduce the jury award to a total of $8.7 million. In doing so, we are mindful of the caution that a "court, lacking clairvoyance, in evaluating a verdict intended to compensate for a projected lifetime of pain, suffering, helplessness and all the other tangible and intangible losses that were sure to follow, face[s] an unusually difficult judgmental responsibility, for the fulfillment of which no less than a sophisticated elasticity will ever do. In no two cases are the quality and quantity of such damages identical * * * evaluation does not lend itself to neat mathematical calculation" (*Caprara v Chrysler Corp.*, 52 NY2d 114, 126-127).

The value put on the projected costs of future care by the jury was so excessive and deviated so greatly from what would be reasonable compensation that a reduction is required. Utilizing a projected cost of $50,000 annually for the residential care which will be necessary (*compare, Kavanaugh v Nussbaum*, 129 AD2d 559), inclusive of equipment and medical costs, for the remaining 63 years of life projected by actuarial tables, we reduce the award for future care to $3,150,000. In reaching the projected annual cost, we have taken into consideration evidence that plaintiff will likely enter a group home at some time. The annual costs of a group residence projected in the evidence ($40,000) would subsume therapy and certain medical costs. We also note that the Board of Education is paying the costs of therapy until plaintiff turns 21 years of age. This annualized cost estimate also correlates, in our review of the record evidence, with a realistic assessment of what plaintiff's financial needs, including home care, will be prior to the time she enters a group residence.

Similarly, although it is clear that she will remain commercially unemployable (*compare, Kavanaugh v Nussbaum, supra*), plaintiff's economist's projections of her potential lost wages were highly speculative (*see, Merrill v Albany Med. Ctr. Hosp.*, 126 AD2d 66, 70 [dissenting in part opn], *appeal dismissed* 71 NY2d 990) and we would reduce that award to $800,000, inclusive of potential wage growth, but also accounting for unexpended costs associated with work and a normal lifestyle. This amount reflects the economist's uncertainty about the probable educational level achievable by plaintiff were she not injured. For a person matching her statistical profile, this amount is within the range between the economist's projections of her future earnings as only a high school graduate and after completion of two years of college, respectively.

The award for pain and suffering also was excessive. Although plaintiff has an awareness of her condition, which must be factored in as a component of suffering and loss of enjoyment of life (*compare, e.g., Merrill v Albany Med. Ctr. Hosp., supra*), a $4.75 million award for both past and future pain and suffering (aggregating in a total award of $8.7 million) would be more in line with current jurisprudence (*see, e.g., Cruz v Mt. Sinai Hosp.*, 191 AD2d 325 [$6.5 million total award]; *see also*, range of pain and suffering awards illustrated by *Sastoque v Maimonides Med. Ctr.*, 161 AD2d 754 [Appellate Division reduced $2,675,000 award to $1,750,000]; *Ebert v New York City Health & Hosps. Corp.*, 186 AD2d 621 [modified in regard to interest rate; Appellate Division reduced $15 million award to $5 million]). In view of the substantial evidence of plaintiff's early life physical, mental and emotional traumas, as measured against the likely stability of her condition during the remainder of her life, we would apportion a significant part of the pain and suffering award to past pain and suffering, for a total increment of $1.6 million for past pain and suffering (16 years), and $3.15 million for future pain and suffering (63 years).

The court erred by not structuring the award in compliance with CPLR article 50-B. In our reading of the statute, as guided by recent Court of Appeals authority, this matter will have to be remanded to the trial court for a determination of two arithmetic values, attorneys fees and the discount factor, before structuring is possible. Upon those determinations, the trial court will have all values necessary for structuring the award, and we direct that such be done in compliance with the statute. However, to provide guidance in exercise of that responsibility, we set forth the following statutory analysis.

CPLR article 50-A (§§ 5031-5039), setting forth the requirement and methodology of structuring the payout of future damages for medical malpractice judgments, and article 50-B (§§ 5041-5049), addressing tort judgments other than medical and dental malpractice, are "virtually identical * * * [W]hatever is held in respect of something in one of the articles is likely to pertain with equal force to the other" (Siegel, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR 5031, 1997-1998 Pocket Part, at 114). The present case originally sounded in medical malpractice as well as negligence, and the decision below alluded to article 50-A, but the verdict was returned on nonmedical malpractice injuries, requiring application of article 50-B. However, the legislative history and subsequent case law interpreting both articles are parallel and pertain equally to the present analysis.

Article 50-A (L 1985, ch 294), the first legislative foray into structuring judgments, was enacted to address a crisis posed by increasing medical malpractice insurance premiums during the early 1980's. It was enacted primarily as a benefit to insurers and, secondarily, to stave off a potential slowdown by medical professionals (Siegel, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR art 50-A, at 711). The article 50-B legislation (L 1986, ch 682), modeled on the prior article 50-A legislation, originated with the Governor's Advisory Commission on Liability Insurance, chaired by former Court of Appeals Judge Hugh R. Jones, which had examined several aspects of proposed tort reform (see, Governor's Mem of Approval for L 1986, ch 682, 1986 McKinney's Session Laws of NY, at 3182 [July 30, 1986]) in the midst of what several institutional commentators concluded was a rapidly escalating liability insurance crisis. This aspect of a larger package of tort reform legislation also was enacted as a benefit for the insurance industry, which assumed the responsibility for most tort defense costs, rather than as a benefit to plaintiffs (see, Mem of State Consumer Protection Board, Bill Jacket, L 1986, ch 682: "a system mandating periodic payments of judgments, poses serious problems for plaintiffs in [personal] injury actions"), and was devised to reduce insurance costs to government as well as private businesses (see, Attorney-General's Mem in Support of S 9391-A, July 21, 1986, Bill Jacket, L 1986, ch 682), a purpose underscored by the fact that, under certain circumstances, such as the death of the plaintiff, plaintiffs will lose the use and even the recovery of portions of future damages, such as pain and suffering or projections for future medi-

cal or health care. Nevertheless, the legislation has withstood constitutional challenges (*Doe v State of New York*, 189 AD2d 199 [4th Dept 1993] [due process challenge; no violation of Americans With Disabilities Act]; *but see,* discussion in Moore, Medical Malpractice, *CPLR Article 50-B Constitutionality for Wrongful Death Actions,* NYLJ, Apr. 4, 1995, at 3, col 1).

Articles 50-A and 50-B provide a detailed mathematical model for calculating future damages for years succeeding a first-year lump-sum payment, up to a definite number of years as determined by the jury or as limited by the statute. A statutory factor of 4% is incorporated annually into the unpaid balance; interest also enhances the award. The arithmetic parts of the statute, CPLR 5031 and 5041, have been described as "circuitous" (*Singletary v Three City Centre*, 158 Misc 2d 841, 846), "vexing" (*Marulli v Pro Sec. Serv.*, 151 Misc 2d 1077, 1080), as "every Judge's nightmare" (*Rohring v City of Niagara Falls*, 153 Misc 2d 1001, 1002, *mod* 192 AD2d 228, *affd as mod* 84 NY2d 60) and "[a]t best * * * ambiguous [which] can lead to inexplicable results" (*Reed v Harter Chair Corp.*, 196 AD2d 123).

Basically, the statute operates by providing for an immediate judgment for a portion of the damages, including all past damages and a portion of future damages, and the balance to be "structured" and paid out in periodic installments over a period of time. The structured judgment consists of separate economic streams of future damages, relating to different elements of the particular future damages award (e.g., medical expenses, future care, lost earnings, pain and suffering), which rely on different calculations and utilize different payout periods, which are aggregated only for purposes of annual payment obligations (which, however, are paid monthly).

The statute applies to judgments entered upon verdicts in medical malpractice actions (CPLR 5031) and in personal injury, property damage or wrongful death actions (CPLR 5041). It separates out future damages for specific treatment, although all damages are still subject to appropriate set-offs and credits to the extent previously authorized under New York civil law (CPLR 5031 [a]; 5041 [a]).

Past damages are still to be awarded as a lump sum. Of the total future damages award, up to $250,000 is still payable as a lump sum upon judgment, which will then be deducted from the total future damages structured award (CPLR 5031 [b]; 5041 [b]). As a practical matter, if the verdict for future damages is less than $250,000, or if the share attributed to nonset-

tling defendants is less than $250,000 (*see, Daversa v P.T.C. Props.*, 165 Misc 2d 345 [App Term, 1st Dept 1995]) then articles 50-A and 50-B are inapplicable. However, determining the portion of the total future damages award from which that $250,000 is to be deducted is less than clear cut. In short, contributions to the $250,000 lump sum are prorated among all elements of the total future damages award, discussed *infra,* each in proportion to the whole. As such, although this lump sum is paid first, it cannot be funded until all elements of the total award are calculated, and reduced to a ratio.

The remaining portion of future damages, if any, will be paid out periodically over a number of years, secured by the purchase of an annuity contract (*see,* CPLR 5031 [e]; 5041 [e]). As to that award, judgment will be entered for the amount of the present value of the annuity contract. The annuity contract is the core innovation of the statute. Upon court directive, which is incorporated as part of the judgment, the defendants and their insurers "shall be required to offer and to guarantee the purchase and payment of * * * an annuity contract * * * [which] shall provide for the payment of the annual payments of such remaining future damages over the period of time" to be calculated under the statute (CPLR 5031 [e]; 5041 [e]; *see also,* CPLR 5042). The annuity contract must be executed by a qualified insurer, and approved by the Superintendent of Insurance (*see,* CPLR 5039, 5049, requiring the Superintendent to establish rules and procedures for determination of an insurer's financial qualifications to provide an annuity contract) as well as by the court (CPLR 5032, 5042). The posting of security to secure such future payments and the respective responsibilities of multiple defendants and insurers also are governed by the statute (*see,* CPLR 5033, 5043).

Lienholders or subrogees, including employers or insurers who provided workers' compensation (*see,* discussion in *Teichman v Community Hosp.*, 87 NY2d 514), may elect to have the portion of future damages allocable to reimbursement paid in a lump sum upon judgment (CPLR 5031 [d]; 5041 [d]).

Litigation expenses and attorneys' fees still are to be paid in a lump sum upon entry of judgment, even though attorneys' fees may be calculated on the basis of the aggregate award when reduced to present value (i.e., the fee is calculated on the basis of the reduced present value of the annuity, and not on the basis of the actual periodic payments realized by plaintiff) (CPLR 5031 [c]; 5041 [c]). Attorneys fees, though, should be apportioned among different parts of the award, so that "each

portion of counsel fees [may] be paid out of the corresponding portion of the verdict upon which the particular portion of the fee is based" (*Reed v Harter Chair Corp.*, *supra,* at 125 [3d Dept 1994]; *see also, Silvestri v Smallberg,* 165 Misc 2d 827, *affd* 224 AD2d 172, *affd* 88 NY2d 1004). Hence, counsel fees relating to past damages would be payable out of the lump sum for past damages award; counsel fees relating to the first $250,000 of the future damages award would be paid out of that lump sum; and counsel fees relating to the remainder of the future damages award are determined on the basis of the present value of the future damages award, but would be debited against the funds dedicated to each part of the periodic payments (*Reed v Harter Chair Corp.*, *supra*). The statutory language had created a calculus that appeared to be unworkable: CPLR 5031 (c) and 5041 (c) contemplate calculating attorneys' fees for future periodical payments on calculations established as part of the "present value" of the annuity contract, but CPLR 5031 (e) and 5041 (e) do not allow the annuity contract to set fixed values on the total award until attorneys' fees already have been deducted (*Reed v Harter Chair Corp.*, *supra*). Resolving the ambiguity in the statute, the Court of Appeals directs that "the proper methodology is to determine the present value of [CPLR 5031 (e) or 5041 (e)] future damages before attorney's fees and then reduce that amount by the present value of attorney's fees" (*Rohring v City of Niagara Falls,* *supra*, at 68; *accord, Reed v Harter Chair Corp.*, *supra*; *but see,* commentary in Mauro, Outside Counsel, *Mathematics, the Law and "Rohring",* NYLJ, Sept. 6, 1994, at 1, col 1, criticizing the *Rohring* mathematical analysis). Since the record in the present case does not indicate the value of this variable, the trial court is directed to determine counsel fees, apportioning such between past and future damages, to incorporate this value into its structuring and to enter judgment accordingly.

After the court makes appropriate adjustments for lump-sum payments, litigation expenses and attorneys' fees, and other liens, the remainder of the future damages award will be secured by the annuity contract. The judgment will be entered based on the "present value" of that contract. The annuity, as with any annuity, will provide for a periodic payment of installments, representing the remaining amounts of future damages, aggregating in a fixed value (CPLR 5031 [e]; 5041 [e]).

Determination of the "present value" of the annuity contract must comport with the formula set forth in the statute (*see,* discussion in Lambrinos and Harmon, *Plaintiff Bias in the*

CPLR 50-A/50-B Statutes, 59 Albany L Rev 693 [1995], which proposes mathematical formulas to derive present value), and is subject to generally accepted actuarial practices (Reed v Harter Chair Corp., supra).

As a first step, the discount factor applicable as of the date of the award (Karagiannis v New York State Thruway Auth., 209 AD2d 993 [4th Dept 1994]; Caruso v LeFrois Bldrs., 217 AD2d 256 [4th Dept 1995]) must be applied against the full amount of the remaining damages (i.e., the total verdict award for future damages reduced by the initial payout of $250,000 and set-offs, etc.). The discount value is calculated on the basis of the rate of wage inflation, the discount rate and the remaining work-life expectancy (see, Lambrinos and Harmon, op. cit., at 695). Although the statute does not require a hearing to determine the applicable discount rate and case law has accorded significant flexibility to the accounting methods utilized by trial courts, essentially rendering it a discretionary determination, the trial court must have some sound basis by which it computes the relevant variables. A hearing has been found to be unnecessary when neither party submitted an expert's affidavit with regard to the appropriate discount rate in effect at the time of the award (Caruso v LeFrois Bldrs., supra [taking judicial notice of New York Times financial data for July 1994, date judgment was entered, 5.5% rate imposed by court was appropriate]; Karagiannis v New York State Thruway Auth., supra [Federal funds rate at time of December 1991 award was 4.43%, rate for long-term Treasury bonds was 7.58%; since majority of award was to be invested in long term annuities, court's imposition of 7% rate was appropriate exercise of discretion]) and when neither party submitted expert evidence demonstrating the actuarial unsoundness of the court's exercise of discretion (Caruso v LeFrois Bldrs., supra). However, the better part of caution would be for a court to elicit the parties' respective positions as to what rate would be appropriate, after which the court could make its own determination (see, discussion in Mauro, Staller and Sullivan, Outside Counsel, Current State of CPLR Articles 50-A, 50-B: Few Answers, New Questions, NYLJ, Jan. 27, 1994, at 1, col 1). Courts have even been permitted to average values from different indices to derive an appropriate rate (Caruso v LeFrois Bldrs., supra; Reid v County of Nassau, 156 Misc 2d 533 [averaging yield on Treasury bonds for 30-year postverdict period]). In the present case, we direct the court to derive an appropriate rate, utilizing accepted actuarial practices, and to incorporate this variable into its structuring formula.

The payments are to be periodic. That is, they will be owed to the plaintiff annually, and will be calculated on an annual basis. However, the annuity contract must provide for payment in equal monthly amounts, and in advance, unless otherwise agreed to by the parties (CPLR 5031 [e]; 5041 [e]). Since the length of time for payment of each element of future damages (e.g., loss of earnings, future medical care costs, future pain and suffering, etc.) may vary, the verdict will provide the period of years for payment of each element of future damages intended to provide compensation. (CPLR 4111[d], [f].) However, with respect to damages for future pain and suffering, the statutes provide that the damages award will be paid out over 10 years, which also is the time period used to compute present value, unless the verdict provides for a lesser time period, in which case the lesser time period governs (CPLR 5031 [e]; 5041 [e]).

The calculation incorporates each element of damages separately in the arithmetic equation: the remaining elements (e.g., medical and related costs; lost earnings; pain and suffering) of future damages (after deduction for the lump sum of $250,000 and further deduction of litigation expenses, attorneys fees, and other set-offs, credits and liens) are each individually divided by the number of years determined by the verdict to be appropriate for each respective element of future damages. As noted, damages for future pain and suffering are structured over either 10 years or the verdict number, if less than 10 years. This calculation then provides an annualized basis for each element of future damages.

After all set-offs are deducted, the first year's payment will reflect the aggregate of the annual payments from each element of future damages. However, each succeeding year up to the final year is enhanced by a statutory multiplier of 4% (CPLR 5031 [e]; 5041 [e]), which is compounded. The compounding works as follows: starting in year two, 4% is added on to the payment made in year one; at the end of year three, 4% is added to the payment made in year two; and so on. This multiplier is based only on the portion of damages that remains subject to continued payment (CPLR 5031 [e]; 5041 [e]). The statute does not explain the origin of this multiplier. Some legislative memoranda and early commentary (*see, e.g.*, Lambrinos and Harmon, *op. cit.*; Mauro, Outside Counsel, *Mathematics, the Law and "Rohring"*, NYLJ, Sept. 6, 1994, at 1, col 1; Mauro, Staller and Sullivan, Outside Counsel, *Current State of CPLR Articles 50-A, 50-B: Few Answers, New Questions,*

NYLJ, Jan. 27, 1994, at 1, col 1) indicated that the Legislature thereby was accounting for presumed inflation, which led to criticism that it imposed redundant inflationary costs on a defendant, insofar as the verdict, itself, to the extent that the fact finder accepts an economist's testimony that incorporates a value for inflation into future damages, already accounts for inflation (*see*, Lambrinos and Harmon, *op. cit.*; Mauro, Outside Counsel, *Mathematics, the Law and "Rohring"*, NYLJ, Sept. 6, 1994, at 1, col 1; Kelner and Kelner, Trial Practice, *Computation of Interest on Future Damage Awards*, NYLJ, Sept. 27, 1994, at 3, col 1). The Court of Appeals initially declined to reach such an argument on the basis of nonpreservation in *Rohring v City of Niagara Falls* (*supra*; *see also*, *Pay v State of New York*, 87 NY2d 1011), but recently has rejected a similar challenge (*Schultz v Harrison Radiator Div.*, 90 NY2d 311; *accord, Karagiannis v New York State Thruway Auth.*, *supra* [court did not err by failing to adjust the future damages award to account for inflation]).

Interest also is a component of the award. Regardless of whether an award is to compensate past damages, future damages, or both, interest is awarded as of the date of the verdict (*Rohring v City of Niagara Falls, supra*; *Pay v State of New York, supra*), and applied against the total sum awarded (CPLR 5002). We note that some commentary contends that the *Rohring* Court was addressing only CPLR 5002 interest, from verdict to judgment, and does not govern for interest postjudgment (*see*, Mauro, Outside Counsel *Mathematics, the Law and "Rohring"*, NYLJ, Sept. 6, 1994, at 1, col 1, basically disagreeing with the *Rohring* analysis; *see generally*, discussion in Kelner and Kelner, Trial Practice, *Computation of Interest on Future Damage Awards*, NYLJ, Sept. 27, 1994, at 3, col 1). Interest is chargeable against the present value of future damages on the date that liability accrued, in this case the date of the verdict (*Rohring v City of Niagara Falls, supra*; *compare, Pay v State of New York, supra* [trial court denied plaintiff summary judgment; Appellate Division reversed; date of Appellate Division order was date liability accrued]).

In the event the judgment creditor dies prior to the end of the judgment term, absent prior agreement to the contrary, the obligation for future installments for medical, dental or health costs, and noneconomic losses not yet due at the time of death, terminates (CPLR 5035 [a]; 5045 [a]). We acknowledge that such a result poses a detriment to the plaintiff, relative to the prior, lump-sum, system, as was noted during the enact-

ment process (*see, e.g.,* Mem of State Consumer Protection Board, *op. cit.*). By contrast, economic costs, such as future earnings, remain payable to those persons to whom the judgment creditor owed a duty of support at the time of his or her death or, in the absence thereof, to the estate, in which case the court, upon application by any party in interest, could then convert the remaining balance to a lump sum by calculating present interest as of that time (CPLR 5035 [b]; 5045 [b]).

The structuring of judgments under articles 50-A and 50-B operates unless the parties agree that it does not operate, and does not interfere with the right of any party to settle (*see,* CPLR 5037, 5047). However, both parties concede that no settlement occurred in this case, contrary to the statement in the decision. Upon the consent of "the claimant" and any party liable, in whole or in part, the portion of future damages attributable to that party might then be paid without regard to article 50-A or 50-B, which would be reflected in the judgment (CPLR 5031 [f]; 5041 [f]). Since plaintiff did not consent in this case, and, on appeal, continues to protest the reduction of the verdict, the court erred in not structuring the award. If the structured award is incorporated in the judgment, but periodic payments at some point prove to be a hardship to the plaintiff (now denominated the judgment creditor), the court, upon application by the judgment creditor and upon specified statutory findings, could then exercise its discretion to direct that the remaining balance, or a portion of such, be paid as a lump sum (CPLR 5036 [a]; 5046 [a]).

Accordingly, the order of the Supreme Court, Bronx County (Bernard Burstein, J.), entered November 6, 1995, setting aside as excessive a jury verdict of $45,295,573, and ordering a new trial on damages, unless, within 20 days of the order, the plaintiff filed with the court a consent to accept the sum of $4.5 million, should be modified, on the law and the facts, to substitute $3,150,000 for future care, $800,000 for future lost earnings, $1,600,000 for past pain and suffering and $3,150,000 for future pain and suffering as the amounts to which plaintiff must stipulate, within 30 days of the date of this order, to avoid a new trial on damages, and in the event plaintiff so stipulates, the matter is remanded to the trial court to determine plaintiff's attorneys' fees, apportioned into components related to past and future damages, respectively, to determine an appropriate discount factor to be applied under CPLR article 50-B, and, thereupon, the court is directed to structure the award in compliance with article 50-B, and the order otherwise affirmed, without costs.

SULLIVAN, J. P., ELLERIN, NARDELLI and MAZZARELLI, JJ., concur.

Order, Supreme Court, Bronx County, entered November 6, 1995, modified, on the law and the facts, to substitute $3,150,000 for future care, $800,000 for future lost earnings, $1,600,000 for past pain and suffering and $3,150,000 for future pain and suffering as the amounts to which plaintiff must stipulate, within 30 days of the date of this order, to avoid a new trial on damages, and in the event plaintiff so stipulates, the matter is remanded to the trial court to determine plaintiff's attorneys' fees, apportioned into components related to past and future damages, respectively, to determine an appropriate discount factor to be applied under CPLR article 50-B, and, thereupon, the court is directed to structure the award in compliance with article 50-b, and the order otherwise affirmed, without costs.