OPINION OF THE COURT
Gerard M. Weisberg, J.
This case brings into perspective the competing interests faced by a State mental health facility. On the one hand, it has its obligation to provide treatment. (See, Youngberg v Romeo, 457 US 307; Excelsior Ins. Co. v State of New York, 296 NY 40, 44.) In doing so, it may not be cast in liability for erroneous medical judgment. (See, Taig v State of New York, 19 AD2d 182.) On the other hand, it has its obligation to the public as a landowner under the "reasonable care” rule. (Basso v Miller, 40 NY2d 233.) At times it may be difficult to balance these two duties. However, today we hold that, on the facts before us, compliance with the former does not immunize *162 the hospital from liability under the latter. This is particularly true where a female octogenarian is unwittingly used as a part of the therapy program for a mental patient.
On June 26, 1981, claimant, Sali Greenfield, then 84 years old, was visiting her son, Theodore, a mentally retarded individual who, at that time, had been a resident at Manhattan Developmental Center (Center) for over one year. This institution is owned and operated by the defendant, State of New York. She saw her son at the Center at least once a week. On this particular day, at approximately 10:00 a.m., claimant arrived and went upstairs to get Theodore. Then the two proceeded to the Center’s backyard where they sat down on a bench. After about 15 minutes, Theodore, who was restless, got up and walked away. Claimant went to join him. While she was walking, she was pushed from behind by Anthony Fontela, a patient residing at the Center. Ms. Greenfield traveled 20 to 22 feet before she finally fell. She hit the ground with her head and arm thereby sustaining injuries.
Mr. Fontela, on the day of the incident, was under one-to-one observation. Ernest Foster, a mental hygiene therapy aide employed at the Center for 10 years, was assigned the task. At approximately 10:45 that morning, he and his charge, neither of whom wore special clothing or uniforms, had just spent about 15 minutes of recreational activity in the yard. The aide then took Mr. Fontela by the right hand and began to walk back to the building with him so that the latter could receive a dose of medication scheduled to be given at 11:00 a.m. The two approached claimant as she was in the process of walking toward her son. Immediately after passing each other, Mr. Fontela spun around and pushed Ms. Greenfield with his left hand. She was sent sprawling.
Mr. Fontela had been admitted voluntarily to the Center on April 21, 1981, on a transfer from Greer-Woodycrest School. A memo prepared at that latter institution on March 20, 1981 states in part that "[i]t is recommended that two strong persons be hired to work full-time with Tony at least 12 hours a day.” His application for admission to the Center states that he required "full time supervision and help with his uncontrolled behavior. At times he is assaultive and self-abusive.” The prior placement at Greer-Woodycrest was terminated, according to the note, "due to his need for a staffing level the agency could not provide.”
Mr. Fontela, who was then 16 years of age, was initially *163 placed on two-to-one supervision. As recorded in his hospital chart, on the day of his admission he was observed to hit his father and knock him to the floor. The following day he was seen attacking other clients. The next day he ran into a wall causing injury to himself. He also knocked a "foster grand parent [sic]” out of her chair, causing injury to her left ear and the left side of her face. That night he was seen jumping up and down and breaking furniture.
An evaluation summary and service plan, completed on May 1, 1981, characterized Mr. Fontela as being severely mentally retarded. Another such document, prepared on May 11, described him as "non-verbal” and, on May 18, he was noted to be assaultive and a behavior problem.
The following notations also appear in Mr. Fontela’s record. "5/3/81 * * * ripping cloths and screaming * * * 5/4/81 * * * upset [,] scratching himself * * * scratches on arm [,] neck & chest * * * 5/5/81 * * * screaming [,] throwing things [,] attacking other clients * * * 5-7-81 * * * throwing chairs.”
On June 10, it was decided that Mr. Fontela’s two-to-one supervision should be reduced to one-to-one. "[F]requent acting out behavior in past few days” was noted on June 19. Four days later, Mr. Fontela was observed "acting up [,] screaming and hitting [his] head [with] his hand.” A cut on the side of his head was recorded. After this incident, during which he also banged his head against a door, he was sent to the Bellevue emergency room. He was returned to the Center late that night. On June 24, Mr. Fontela was again "acting up * * * throwing things [,] running up & down constantly.” The next day he was observed to be "acting up badly * * * running around banging [his] head against [the] wall.”
Norman Weiss, a psychiatrist, testified as an expert for the claimant. After reviewing Mr. Fontela’s medical record and the incident report prepared with respect to the occurrence, Dr. Weiss observed that the assailant’s behavior was quite impulsive and, therefore, unpredictable. He stated that Mr. Fontela’s severe mental handicap would account for a picture of erratic behavior, impulsivity and violence directed either at himself or others. In such circumstances, a high degree of supervision is required. Significantly, contact between such an individual and visiting members of the general public, who are not prepared for this unpredictable type of behavior, is contraindicated. Dr. Weiss concluded that the supervision of Mr. Fontela was a departure from good medical practice.
*164 On cross-examination, Dr. Weiss stated that improved socialization is a desirable goal for a patient like Mr. Fontela. This includes permitting access to other people. However, the degree of contact depends on the severity of the handicap. In view of the history of the assailant, Dr. Weiss would not have allowed Mr. Fontela to have access to a visiting area on the day in question. To attempt to "socialize” this patient when he is displaying dangerous impulsive behavior does not aid his recovery, added Dr. Weiss who, thereafter on redirect, reiterated his opinion that it was a departure from reasonable psychiatric practice to allow Mr. Fontela to be in the presence of lay persons who would be little prepared for his sudden outbursts.
While not an insurer, the State, as owner of the Center, was under a duty to exercise reasonable care to protect visitors on its premises from risk of harm. Foreseeability defines the obligation and hence is a measure of liability. (Basso v Miller, 40 NY2d 233, 241, supra.) Culpability of a governmental entity in its proprietary capacity will often take the form of permitting the continued existence of a dangerous physical condition. (Van Stry v State of New York, 104 AD2d 553; Burton v State of New York, 90 AD2d 585; Gramm v State of New York, 28 AD2d 787, affd 21 NY2d 1025; Meyer v State of New York, 92 Misc 2d 996.) However, the State may also be liable as a landowner for allowing third parties to create a hazardous condition on its property. (Drake v State of New York, 97 Misc 2d 1015, affd 75 AD2d 1016, 1017; Townsley v State of New York, 6 Misc 2d 557; see, Caldwell v Village of Is. Park, 304 NY 268.)
It is undisputed that in the instant case, Mr. Fontela was permitted by employees of the defendant to mingle with visitors. Both the hospital record of this unfortunate individual and the testimony of Dr. Weiss establish that the assailant was subject to fits of impulsive and violent conduct. Although there were periods when Mr. Fontela’s behavior would appear to have become subdued, his self-destructive and dangerous tendencies would periodically reassert themselves. Indeed, after a period of relative calm in late May, he was sent to Bellevue subsequent to a violent outburst on June 19. Also, on each of the two days preceding the incident involving claimant, he is noted to have manifested his impulsivity. In view of this, it was foreseeable that there would be a recurrence of volatile fits, a potential that constituted a hazard for those *165 unwary persons who happened to be in the vicinity when Mr. Fontela had one of his explosive displays.
We conclude that the State, through its employees, breached its duty to protect visitors to the Center from foreseeable risk of harm by permitting the presence of Mr. Fontela in an area it had made accessible to the visiting public. (Basso v Miller, 40 NY2d 233, supra; Scurti v City of New York, 40 NY2d 433.) It must, therefore, respond in damages for injuries proximately caused. We also find that claimant did not assume the risk that she would be in the company of a dangerous individual when she visited her son. (Cf. CPLR 1411.) Rather, she could reasonably expect that a person such as the assailant, who could perhaps be described as a bomb waiting to explode, would not be permitted to be in such close proximity to her. She cannot, therefore, be charged with any culpability for being in the area of the occurrence or for failing to closely scrutinize every patient in her immediate presence.
Defendant, however, argues that the attendance of Mr. Foster, its employee assigned to the one-to-one supervision of Mr. Fontela, absolves it of liability. We disagree. Mr. Fontela, as we have found, was so volatile as to constitute a hazard by his very presence. No degree of watchfulness on the part of a single employee could have prevented an outburst such as the one that occurred. Mr. Fontela simply should not have been in an area occupied by visitors. Moreover, even assuming that an employee’s presence was an appropriate safeguard for a violent eruption by Mr. Fontela, Mr. Foster negligently failed to prevent such an occurrence. Although he was in such close proximity to his charge that he was holding the latter’s hand, he neglected to take those precautionary steps that would have prevented the attack. The very purpose of his assignment was "supervision.” This entails making a reasonable attempt to prevent the patient from harming himself or others. In this regard, we observe that it was possible to hold Mr. Fontela’s hand so that he would have been kept a safe distance from those around him. Instead, he was brought dangerously near an 84-year-old woman. Given his violent proclivity, the results were predictable.
The State also argues that it should not be liable for damages arising from this incident because it was merely exercising medical judgment in the decision to allow the assailant access to the area open to visitors. It is hornbook law that the State, in the operation of its mental institutions, is only liable for hazards reasonably to be foreseen (Excelsior *166 Ins. Co. v State of New York, 296 NY 40, supra; Flaherty v State of New York, 296 NY 342), and will not be cast in liability for the erroneous exercise of a medical judgment (St. George v State of New York, 283 App Div 245, affd 308 NY 681; see, Oelsner v State of New York, 66 NY2d 636). In this context, the defendant argues that a process of "socialization” was being attempted with respect to Mr. Fontela. This entailed permitting him to mingle with visitors to the Center while under one-to-one supervision, it is urged.
No expert testified for the State. Rather, an attempt was made to establish the parameters of the socialization process during the cross-examination of Dr. Weiss. The doctor agreed that generally it is proper to try to conform behavior to a normative standard. However, he was emphatic in his opinion that the procedures followed in this case were improper. We cannot infer otherwise from the arguments of defendant’s attorney.
Moreover, we concur with Dr. Weiss and find that the mode of patient supervision employed here created a foreseeable hazard. (See, Killeen v State of New York, 104 AD2d 586.) Negligence, not erroneous medical judgment, was involved. (See, Huntley v State of New York, 62 NY2d 134.) This culpability arises both in the context of the State’s duty as a landowner and as an operator of a mental health facility with supervisory responsibilities.
Defendant cites in support of its position two cases decided by this court. Both are distinguishable. The first, Marin v State of New York (NYLJ, Aug. 24, 1982, p 6, col 4), dealt, as does the instant case, with a sudden assault on a visitor by a patient of a developmental center. However, the assailant in that case was not so violently impulsive as to require the one-to-one supervision that was assigned to Mr. Fontela. Thus, the former attacker did not constitute the foreseeable hazard posed by the latter. Moreover, claimant in Marin did not introduce expert testimony. The court was thus left to speculate whether an incorrect medical decision was the operative factor and a finding of liability would have been improper. (Cole v Swagler, 308 NY 325.) In contrast, Mr. Fontela’s history, coupled with Dr. Weiss’ testimony established "something more” than judgmental error. (Homere v State of New York, 48 AD2d 422.)
The second case cited by defendant, Greene v State of New *167 York (Ct Cl, Apr. 26, 1983, Weisberg, J.), is also inapposite. There an attack by one patient upon another served as the basis for the claim. Moreover, defendant established, through extensive expert testimony, that the underlying controversy could at best be described as a disagreement between experts. Dismissal was, therefore, warranted.
Turning now to the question of damages, the evidence established that as a result of her fall, claimant fractured two fingers on her right hand. These were, as described by Ms. Greenfield, the pinky and the ring finger. After being taken to St. Vincent’s Hospital, the former digit was set and a soft cast was applied from the fingers to the elbow. Claimant described the experience as being agonizingly painful. She was released from the hospital after five or six hours.
The cast was worn for approximately a week and was then replaced by another which was not removed for five weeks. During this time she went back to the hospital about once a week. After removal of the cast, she was given therapy which consisted of massage, exercise and the application of heat.
Ms. Greenfield, who is right-handed, was not able to write for two or three months. After the cast was taken off, it was at least 8 to 10 weeks before she could even use her hand. She also began to suffer from dizzy spells and insomnia after the mishap and has taken the drugs Seconal and Darvon, in addition to aspirin.
Currently, claimant has not recovered the full use of her fingers. Specifically, she cannot hold things, such as a coffee cup, as well as she could before the incident. Additionally, the right-ring finger has never fully straightened out. This fact was evident when claimant displayed her hand to the court.
Expert testimony by Dr. Weiss confirmed that the attack by Mr. Fontela was the competent producing cause of the injuries.
According to the testimony of claimant’s son, Martin I. Greenfield, immediately after the accident, he observed discolorations, abrasions and blood clots on his mother’s face. He was present when the fracture was set. His mother, at that time, appeared to be in extreme pain.
Upon the foregoing, we award claimant $22,500 for all damages suffered as a result of the incident of June 26,1981.