Carmen **ESTEVEZ, Candida Estevez, Zobeyda Estevez, Yaneira Estevez, an infant fourteen years of age or older by her father and natural guardian, Maximo Rafael Estevez, and Maximo Rafael Estevez, individually, and Joseph Rodriguez Estevez, an infant under the age of fourteen by his mother and natural guardian, Zobeyda Estevez, and Zobeyda Estevez, individually, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

No. 97 Civ. 8234(SAS).

United States District Court, S.D. New York.

July 15, 1999.

Alvin H. Broome, Ginsberg & Broome, LLP, New York, New York, for Plaintiffs.

Irene Chang, Assistant United States Attorney, Southern District of New York, New York, New York, for Defendant.

### *AMENDED OPINION AND ORDER*

SCHEINDLIN, District Judge.

This negligence action arises out of an automobile accident resulting in personal injuries to various members of the Estevez family. Jurisdiction is premised under the Federal Tort Claims Act, 28 U.S.C. §§ 1346 9(b), 2671–80 ("FTCA"), because the car in which plaintiffs were riding on October 11, 1996, collided with a United States postal truck. This case was tried to the court between March 1 and March 22, 1999. The following constitutes the court's findings of fact and conclusions of law.

1. The liability phase of the trial was heard on March 1 and March 2, 1999. At the conclusion of the evidence, the Court made oral findings of fact and conclusions of law on the record. *See* March 1 & 2 Transcript of Proceedings ("Tr.I") at 237–43. In short, the United States was found to be negligent, based on the actions of the driver of the postal truck. As a result, evidence was submitted by plaintiffs and defendant with respect to damages.

2. The Sixth and Seventh Counts of the complaint, which are the claims of plaintiffs Zobeyda Estevez and Maximo Rafael Estevez for parental loss of service, society and opportunities related to plaintiffs Joseph Rodriguez Estevez and Yaneira Estevez are dismissed. No such claims were presented administratively nor were administrative remedies exhausted, prior to the filing of this lawsuit, as required by the FTCA. *See* 28 U.S.C. § 2675(a); *McNeil v. United States,* 508 U.S. 106, 111, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993).

3. On the evening of October 11, 1996, the Estevez vehicle was driven by Pedro Estevez. Tr. I at 61–62 (Testimony of Pedro Estevez). Pedro is not a plaintiff. The passengers in his car included his aunt, Carmen, age 46, who was seated in the front passenger seat. Tr. I at 62 (Testimony of Pedro Estevez). She was wearing a seat belt. Candida, Pedro's mother, age 56, was seated behind him in the rear seat. *Id.* She was not wearing a seatbelt. March 2–22 Transcript of Proceedings ("Tr.II") at 164 (Testimony of Candida Estevez). Next to her was her daughter Zobeyda, age 31, who carried her infant son Joseph on her lap. Tr. I at 62 (Testimony of Pedro Estevez); Tr. II at 247 (Testimony of Zobeyda Estevez). She wore a single seatbelt fastened around her and Joseph. Tr. II at 247 (Testimony of Zobeyda Estevez). Next to Zobeyda was her cousin Yaneira, age 13, who was riding in the rear seat without a seatbelt. Tr. I at 62 (Testimony of Pedro Estevez); Tr. II at 232–33 (Testimony of Yaneira Estevez). All of the passengers sustained injuries in the crash and were taken to the emergency room at the Jacobi Medical Center. Plaintiff's Exhibit ("PX") 8, 21a & b, 32, 35, 41.

4. The Government's liability pursuant to the FTCA is determined under New York law. 28 U.S.C. § 1346(b). There is no precise rule for determining pain and suffering and a trier of fact is bound by a standard of reasonableness in light of all the evidence. *Paley v. Brust,*

21 A.D.2d 758, 250 N.Y.S.2d 356, 357 (1st Dep't 1964). Courts may award "fair and just compensation for any injuries proximately caused by the negligence of the Government's employees." *Goldstein v. United States,* 9 F.Supp.2d 175, 188 (E.D.N.Y.1998). "[P]rior verdicts may guide and enlighten the court and in a sense, may constrain it." *Senko v. Fonda,* 53 A.D.2d 638, 384 N.Y.S.2d 849, 851 (2d Dep't 1976) (citations omitted); *see also, Corbin v. Grand Union Co.,* No. 96 Civ. 4626(SWK), 1997 WL 739583, at *10 (S.D.N.Y. Nov. 26, 1997) (examining New York cases to determine appropriate compensation for past and future pain and suffering).

5. " 'Each passenger has an independent common-law duty to exercise reasonable care for his [or her] own safety.' " *Enders v. Boggs,* 178 Misc.2d 528, 679 N.Y.S.2d 561, 562 (Supt. Ct. Rensselear Co.1998 (citing cases)). A passenger must exercise reasonable care and mitigate damages by wearing seatbelts. *Diehl v. Ogorewac,* 836 F.Supp. 88, 94 (E.D.N.Y. 1993); *Roach v. Szatko,* 244 A.D.2d 470, 664 N.Y.S.2d 101, 102 (2d Dep't 1997); *Curry v. Moser,* 89 A.D.2d 1, 454 N.Y.S.2d 311, 316 (2d Dep't 1982). Similarly, a passenger cannot ride in an unreasonable position. "[T]o the extent that an occupant of a motor vehicle positions herself or himself in such manner to permit or even enhance the possibility of [a] physical impact, an issue arises analogous to the situation where a seatbelt is not used." *Enders,* 679 N.Y.S.2d at 563.

6. Any award for future damages must account for the time value of money. *Oliveri v. Delta,* 849 F.2d 742, 751 (2d Cir.1988); *Metz v. United Technologies Corp.,* 754 F.2d 63, 68 & n. 3 (2d Cir.1985). Accordingly, any award for future pain and suffering may be discounted to present value at an appropriate rate based on the evidence. *See Oliveri,* 849 F.2d at 751 & n. 8. However, the methods for accounting for time value of money

vary. *Ramirez v. New York City Off-Track Betting Corp.*, 112 F.3d 38, 41 n. 3, 42 n. 5 (2d Cir.1997).

7. Section 5041 of the New York Civil Practice Law & Rules ("N.Y.CPLR") governs damage awards in personal injury matters. N.Y. CPLR § 5041(b) states that "[t]he court shall enter judgment in lump sum for past damages, for future damages not in excess of two hundred fifty thousand dollars, and for any damages, fees or costs payable in lump sum or otherwise under subdivisions (c) and (d) of this section." N.Y. CPLR § 5041(e) provides that when future damages in excess of $250,000 are awarded,

> [t]he court shall enter a judgment for the amount of the present value of an annuity contract that will provide for the payment of the remaining amounts of future damages in periodic installments. The present value of such contract shall be determined in accordance with generally accepted actuarial practices by applying the discount rate in effect at the time of the award to the full amount of the remaining future damages, as calculated pursuant to this subdivision. The period of time over which such periodic payments shall be made and the period of times used to calculate the present value of the annuity contract shall be the period of years determined by the trier of fact in arriving at the itemized verdict; provided, however, that the period of time over which such periodic payments shall be made and the period of time used to calculate the present value for damages attributable to pain and suffering shall be ten years of the period of time determined by the trier of fact, whichever is less.

8. Any award for future loss of earnings "must be discounted to reflect the fact that, even if there were no inflation, a dollar received today is worth more than the right to receive a dollar in the future." *Ramirez*, 112 F.3d at 41.

■ 9. I find that any award for lost earnings need not be calculated as an af-ter-tax net amount. I note that in cases applying federal law, the court (or the jury) must consider the effect of income tax on the estimated amount of lost wages. *See Norfolk & Western Railway Co. v. Liepelt*, 444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980) (holding that it was error to exclude evidence of decedent's future taxes in case brought under Federal Employers' Liability Act); *Fanetti v. Hellenic Lines Ltd.*, 678 F.2d 424, 431 (2d Cir.1982) (extending principle "at least to all claims for future wages based solely on federal law").

■ The Federal Tort Claims Act, however, provides that

> The United States shall be liable ... in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.

Thus, damages are assessed against the United States according to the law of the state where the tortious activity took place. New York law is clear that taxes are not deducted from an award of lost earnings, but rather that the gross amount of lost wages is to be awarded. *See Johnson v. Manhattan & Bronx Surface Transit Operating Authority*, 71 N.Y.2d 198, 524 N.Y.S.2d 415, 419, 519 N.E.2d 326 (1988) ("without express statutory direction to the contrary, the damages component of a plaintiff's award as to lost wages ... should be based on gross projected earnings and no deduction or consideration of after-tax net should be allowed into evidence or charged to the jury"); *McKee v. Colt Electronics Co., Inc.*, 849 F.2d 46, 49 (2d Cir.1988) ("it is now abundantly clear that under New York law the calculation of plaintiff's damages must be made as if taxes did not exist").

The law in this Circuit is not to the contrary. In *O'Connor v. United States*, 269 F.2d 578 (2d Cir.1959), the Court of Appeals held that taxes should be consid-

ered when computing lost earning in a case of wrongful death under the FTCA. One year later, however, the Court limited this holding, clarifying that the Court in *O'Connor* had based its decision on the Oklahoma law of damages. *McWeeney v. New York, New Haven and Hartford Railroad Co.*, 282 F.2d 34, 39 (2d Cir.1960).[1] The instant case, of course, is governed by New York law, which, as stated above, adheres to a different rule than Oklahoma.

I note that a substantial number of courts have held that it is appropriate to deduct taxes from earnings awarded under the FTCA. *See, e.g., Shaw v. United States*, 741 F.2d 1202 (9th Cir.1984); *Flannery v. United States*, 718 F.2d 108 (4th Cir.1983); *Harden v. United States*, 688 F.2d 1025 (5th Cir.1982); *Battista v. United States*, 889 F.Supp. 716 (S.D.N.Y.1995). I do not, however, find these cases persuasive. Each of them is based on the FTCA's prohibition on assessing punitive damages against the Government. Thus, they reason that because a plaintiff would have been required to pay taxes on the income he would have received in the absence of the Government's negligence, failing to account for taxes in a damage award is equivalent to assessing noncompensatory, and thus punitive, damages against it. With the Supreme Court's holding in *Molzof v. United States*, 502 U.S. 301, 112 S.Ct. 711, 116 L.Ed.2d 731 (1992), however, this reasoning is no longer convincing. In *Molzof*, the Court held that the only "punitive damages" barred by the FTCA are those "legally considered 'punitive damages' under traditional common-law principles," namely damages based on plaintiff's intentional misconduct. *Id.* at 312, 112 S.Ct. 711. I agree with those courts that have held that the failure to deduct taxes does not amount to "punitive damages," as the Supreme Court has now defined it. *See, e.g., Palmer v. United States*, 146 F.3d 361, 367 (6th Cir.1998); *Manko v. United States*, 830 F.2d 831, 837

(8th Cir.1987); *Ferrarelli v. United States*, 90 Civ. 4478, 1992 WL 893461, at *9–11 (E.D.N.Y. September 24, 1992).

Thus, the Government is not entitled to the deduction of taxes from the lost earnings awarded here.

■ 10. An infant plaintiff may recover for future lost earnings. Even where the computation of future earnings of an infant plaintiff is "speculative and fraught with difficulties," the "loss of future earnings of an infant plaintiff is properly compensable." *Kavanaugh v. Nussbaum*, 129 A.D.2d 559, 514 N.Y.S.2d 55, 59 (2d Dep't 1987), *mod. on other grounds*, 71 N.Y.2d 535, 528 N.Y.S.2d 8, 523 N.E.2d 284 (1988). *See also Altman v. Alpha Obstetrics and Gynecology*, 255 A.D.2d 276, 679 N.Y.S.2d 642, 644 (2d Dep't 1998) (upholding award of $3,000,000 to infant plaintiff for future lost earnings considering that father had a PhD in education and brother was an honor student at Tufts and assuming that infant plaintiff would have graduated college); *Sullivan v. Locastro*, 178 A.D.2d 523, 577 N.Y.S.2d 631 (2d Dep't 1991); *Ledogar III v. Giordano*, 122 A.D.2d 834, 505 N.Y.S.2d 899, 903 (2d Dep't 1986).

*Zobeyda Estevez*

11. There is no dispute that Zobeyda sustained four fractured ribs and a lacerated spleen. Tr. II at 1218 (Government Summation); 956 (Testimony of Dr. Barron). She remained in the hospital for three days from October 12th through October 14th. Tr. II at 1250 (Defense Summation); PX 41. No surgery was required. Tr. II at 691 (Testimony of Zobeyda Estevez).

■ 12. As noted earlier, Zobeyda wore a seat belt around both her and her infant son Joseph, who was seated on her lap. Tr. I at 62 (Testimony of Pedro Estevez); Tr. II at 247 (Testimony of Zobeyda Estevez). At the time of the impact, Joseph's body crushed Zobeyda's ribs and

---

1. To the extent that *McWeeney* held that taxes are not to be deducted under the FELA, it appears to have been overruled by *Liepelt* and *Fanneti*.

spleen. Tr. II at 957–959 (Testimony of Dr. Barron). Thus, the inherently dangerous seating arrangement, selected by Zobeyda, was surely a contributing cause of her injury. *Id.* at 957–59; 995–96 (Testimony of Dr. Barron). Thus, I conclude that Zobeyda is fifty percent (50%) liable for her own injuries.

13. I conclude that the total value of her past pain and suffering is $30,000. *See Simone v. Crans,* 891 F.Supp. 112, 113 (S.D.N.Y.1994) ($20,000); *Nelson v. State,* 105 Misc.2d 107, 431 N.Y.S.2d 955 (Ct.Cl.1980) ($16,000). When reduced by 50%, Zobeyda is awarded a total recovery of $15,000. No award is made for future pain and suffering.

### Yaneira Estevez

14. Yaneira suffered lacerations to the forehead and scalp. Tr. II at 354 (Testimony of Dr. Sharzer); 382 (Testimony of Dr. Lesesme). She spent three days in the hospital and seven days at home in bed. *Id.* at 231–32 (Testimony of Yaneira Estevez). While in the hospital she had stitches and a drain in her scalp. *Id.* at 410, 413 (Testimony of Dr. Lesesme). The hospital record is silent as to the number of stitches. She still has a scar on her forehead, which the Court has personally viewed. The scar is approximately nine centimeters long, running from the hair line, across the lower eyebrow, and down a bit below the eyebrow. *Id.* at 354 (Testimony of Dr. Barron); 382 (Testimony of Dr. Lesesme). She also has a tingling sensation or numbness in the area of the scar. *Id.* at 353 (Testimony of Dr. Sharzer). The scar on her forehead is a flat thin scar without pigmentation change. *Id.* at 385 (Testimony of Dr. Lesesme). This is a superficial laceration. *Id.* at 388. The scar crosses directly over the frontal nerve, but did not cut that nerve. *Id.* at 387–88. The forehead scar is permanent. *Id.* at 354 (Testimony of Dr. Sharzer); 415 (Testimony of Dr. Lesesme). While there may have been a deeper laceration to the scalp, it is not visible as it is covered by Yaneira's hair. It is unclear whether plastic surgery on the forehead scar would be required.

15. Yaneira did not wear a seatbelt. At the time of the injury she was 13 and a half years old. She was old enough, and experienced enough to know that she should have worn a seatbelt. However, there was no credible evidence at trial that her injury would have been any different had she been wearing her seatbelt. Tr. II at 379 (Testimony of Dr. Lesesme). Under these circumstances, there is no basis for a reduction in the damage award based on her failure to wear a seatbelt.

16. Yaneira is a young girl with a permanent facial scar. The Court concludes that she is entitled to a total award of $25,000 for past pain and suffering and $75,000 for future pain and suffering. *See Mione v. Toys 'R Us, Inc.,* 97 Civ 2363 (E.D.N.Y. October 23, 1998) ($150,000); *Dean v. Thrifty Rent–A–Car Systems, Inc.,* (Sup.Ct.N.Y.Co. August 26, 1996) ($400,000—included three lacerations to forehead, 33 stitches, post traumatic stress disorder, 22 months of psychiatric treatment); *Campbell v. New York City Health and Hospitals Corporation,* (Sup.Ct. Kings Co. May 6, 1987) ($200,000); *Green v. Tanyi and JEM, Inc.,* (Sup.Ct. Erie Co. June 19, 1996) ($177,750—facial lacerations requiring 45 stitches). Based on a discount rate of 2% for a term of three years, the present value of Yaneira's future pain and suffering is $70,589. Thus, Yaneira's total award is reduced to $95,589. The attorney's fee for Yaneira is $23,897 (25% of Yaneira's award), plus reimbursement to counsel for all actual and necessary expenses. Counsel is directed to deposit Yaneira's portion of the award either in the highest time deposit savings bank accounts available or to purchase a treasury bill for her which funds are not to be released until age 18.

### Candida Estevez

17. Candida sustained a comminuted and non-displaced fracture at the base of

her left fifth metacarpal in her nondominant hand. Tr. II at 613–14 (Testimony of Dr. Grad); 916, 937 (Testimony of Dr. Barron) ("minimally comminuted" and "slightly displaced"). Her left ring and small finger were immobilized along with her wrist in an ulnar gutter splint. *Id.* at 615–17 (Testimony of Dr. Grad); 930 (Testimony of Dr. Barron). The total period of immobilization was six weeks. PX 36 (Candida's hospital record) at p. 142. She was then treated with a course of physical therapy, but it appears that she did not attend as frequently as recommended by the doctors. Tr. II at 662–65 (Testimony of Dr. Grad); 946 (Testimony of Dr. Barron). While the doctors suggested that she attend twice a week, it is unlikely that she received physical therapy even once a week. PX 36; Tr. II at 935 (Testimony of Dr. Barron) ("some evidence of noncompliance"). The doctors also recommended that she use flexion splints at home, but she did not do so. PX 36 at p. 137. In addition, Candida suffered an injury to the middle finger of her left hand in a 1989 mugging. Tr. II at 619; 645–46 (Testimony of Dr. Grad); 939–40 (Testimony of Dr. Barron). Indeed, her current X-rays revealed a healed bone injury to her left middle finger. *Id.* Candida testified that following the 1989 injury she had stiffness in her left hand and was unable to make a fist. Tr. II at 160 (Testimony of Candida Estevez).

18. Candida was not wearing a seatbelt. It is unclear, however, whether her failure to wear the seatbelt contributed to the severity of the injury. Because the defendant has failed to establish that plaintiff's failure to wear her seatbelt contributed to her injury, the Court cannot conclude that plaintiff failed to mitigate her damages by her failure to wear her seatbelt.

19. However, the Court does make the following factual findings, based primarily on the testimony of the expert witnesses. Plaintiff called Dr. Grad as her expert with respect to her hand injury. Defendant relied on Dr. Barron. I found the testimony of Dr. Barron to be more persuasive. In addition, I did not find Candida's testimony with respect to the sequelae of her prior injury to be credible. Thus, I conclude that Plaintiff failed to follow the recommendations of her doctors with respect to resetting the ulnar gutter splint, the frequency of physical therapy and the use of flexion splints. Also, the stiffness in plaintiff's left hand and her weakened grasp were likely present prior to this injury. Tr. II at 647–50, 655, 659–60, 668 (Testimony of Dr. Grad); 910–11, 917, 927–32, 934–35 (Testimony of Dr. Barron).

20. A plaintiff must prove that her injuries are a result of this accident, and not a preexisting injury. *See Bekiaris v. United States,* 96 Civ. 302(MGC), 1998 WL 418917, at*5 (S.D.N.Y. July 23, 1998); *Rivera v. Pula,* 173 A.D.2d 1000, 569 N.Y.S.2d 517, 517–18 (3d Dep't 1991). The weight of the reliable medical testimony is that a comminuted and displaced fracture of the fifth metacarpal should have healed well with the proper course of treatment. Tr. II at 662 (Testimony of Dr. Grad); 934–35 (Testimony of Dr. Barron).

21. Under these circumstances, Candida Estevez is awarded $25,000 to cover past pain and suffering attributable solely to the fracture to her fifth metacarpal joint. *See Greenfield v. State,* 130 Misc.2d 161, 495 N.Y.S.2d 611 (Ct.Cl.1985) ($22,500 award for fractures of two fingers of dominant hand, requiring cast for six weeks and subsequent physical therapy, and inability to use hand for two to three months); *Chase v. Pace Elevator, Inc. et al.,* (Sup.Ct.N.Y.Co. March 11, 1994) ($66,000 for fractures of fourth and fifth metacarpals of dominant hand).

*Carmen Estevez*

22. Carmen Estevez, a restrained passenger in the front seat of the car, suffered a compression fracture of the L1 vertebra as a result of the accident. There is no dispute on this issue. *See* Tr. II at 449 (Testimony of Dr. Sherry); Tr. II at 786

(Testimony of Dr. DiGiacinto). At the time of the accident she was 46 years old. *See id.* at 47 (Testimony of Carmen Estevez). She was employed as a home health aide, earning approximately $20,000 a year. *Id.* at 121, 123 (Testimony of Nicholas LaLanne). She had worked on the same job, administering to the same patient, for approximately eight years prior to the accident. The job involved heavy physical labor including lifting her patient in and out of the bath. *Id.* at 72 (Testimony of Carmen Estevez).

23. Carmen was hospitalized for a period of three weeks post accident and treated with a back brace, or body jacket, which she wore for the next three and a half months. *Id.* at 49–51. Although the hospital record is missing, there is no dispute that she was hospitalized, that there was no surgery and that she was released with the body jacket. *Id.* at 48–50. Treatment records indicate that she was able to ambulate successfully after her release. *See* PX 25. Both the plaintiff's and the defendant's doctors agree that she is unable to engage in heavy lifting. *See* Tr. II at 461–462 (Testimony of Dr. Sherry); Tr. II at 816–817 (Testimony of Dr. DiGiacinto). She continues to wear a corset as a back brace. *See id.* at 64 (Testimony of Carmen Estevez).

24. The disputed issues in Carmen's case are: (1) whether she has continuing pain as a result of this injury; (2) whether she is totally disabled and therefore unable to work as a result of this injury; and (3) whether she failed to mitigate her damages by seeking alternative employment.

25. The plaintiff relied on the testimony of Dr. Herbert Sherry, an orthopedic surgeon. Plaintiff also offered the testimony of Mr. Edmund Provder, a vocational and rehabilitation counselor. *See id.* at 700–701 (Testimony of Edmund Provder); PX 29. The defendant relied on the testimony of Dr. George DiGiacinto, a neurosurgeon. Both Dr. Sherry and Dr. DiGiacinto were retained experts.

26. Dr. Sherry and Dr. DiGiacinto reached very different conclusions. Dr. Sherry examined Carmen in October, 1998. Based on his examination and the records he reviewed, he found that in addition to the compression fracture, she has radiculopathy in her left leg, which he attributes to a 30 degree angulation of the spine and a retropulsion of bone into the spinal canal, causing a narrowing of space in the spinal cord and pressing on nerves in the spinal cord. He concludes that these conditions are the cause of Carmen's continuing pain and also limit her ability to do certain types of work. *See* Tr. II at 468–470, 476–478 (Testimony of Dr. Sherry).

27. Dr. DiGiacinto examined Carmen on July 24, 1998, and reviewed her medical records. He found a healed compression fracture of the L1 vertebra. He found only a 15% angulation of the spine which is not disabling and should not cause pain. Finally, he testified that while there is some retropulsion of bone into the spinal canal, it is very little and without clinical significance. The bone is not pressing on the spinal cord or any nerves, is not narrowing the space between the vertebrae and is not causing radiculopathy. His review of the February, 1997 MRI reveals no nerve root compression or narrowing of the spinal canal. He concludes that Carmen's fracture is healed, the spine is stable and the degree of angulation is insignificant. *See id.* at 793–794 (Testimony of Dr. DiGiacinto).

28. Based on my review of the testimony and the medical records, there is no medical support for the complaints of continuing pain and radiculopathy. I found Dr. DiGiacinto's testimony to be entirely credible. I therefore conclude that Carmen sustained a compression fracture of the L1 vertebra which is now fully healed, although she does have two permanent conditions: a 25% loss of height in the posterior portion of that vertebra and a 15 degree angulation of the spine. Neither of these permanent conditions typically result in continued pain. Because of these

conditions, however, she is unable to lift heavy objects. This does not make her totally disabled. Finally, while I agree that Carmen cannot return to her former employment, no evidence was offered that Carmen has tried to obtain alternative employment.

29. On the other hand, I accept Carmen's testimony that she continues to experience back pain as a result of her injury. Pain is idiosyncratic and medicine cannot explain every symptom. For example, Dr. DiGiacinto did find traumatic arthritis at the site of the healed fracture, which typically does not result in pain. However, Carmen may experience pain from this condition. She has a long and good employment record. She has no record of seeking disability or welfare benefits prior to the accident or of any criminal activity. While her reports of symptoms and pain have been inconsistent, this alone does not mean that she has not experienced some level of pain since the accident.

30. As noted earlier, I find that Carmen cannot return to her prior employment which requires heavy lifting. However, I reject Mr. Provder's conclusion that she is totally disabled and cannot work. While it is true that she has only done physical labor, there are many jobs in the economy that are defined as physical labor that do not require heavy lifting. I reject Mr. Provder's conclusion that those jobs are eliminated because Carmen does not speak or write English. Finally, there is no medical support for the conclusion that Carmen's injury resulted in any neck or upper body limitations. Carmen's failure to attempt to find alternative employment must reduce any award of lost earnings.

31. Under the circumstances, I find that the following award for lost wages is appropriate: (1) for the first six months post accident—$13,500 (100% of her 1995 annual salary); (2) for the next two years (until the date of the trial) $27,-000 (50% of her 1995 annual salary); (3) for the remaining 15 years of her work-life

expectancy $2,700 per year (or $40,500), based on a 10% reduction in earning capacity because of her inability to do heavy lifting. As she has no other permanent disability, I conclude that she is capable of finding alternative employment, albeit at a somewhat lower pay. Thus, Carmen is awarded $40,500 in past lost earnings and $40,500 in future lost earnings. Based on a discount rate of 2% for a term of fifteen (15) years, the present value of Carmen's future lost earnings is $29,912.

32. As to pain and suffering, I conclude that the following award is appropriate. (1) Past pain and suffering: $100,-000; (2) future pain and suffering: $50,-000. Thus, the total award for pain and suffering is $150,000. Based on a discount rate of 2% for a term of ten years, the present value of Carmen's future pain and suffering is $40,854 and therefore, the total award for pain and suffering is reduced to $140,854.

33. The total award is $231,000, prior to a reduction to present value. Properly reduced, Carmen's total award is $211,266. This award is in the range of damages awarded in cases in which plaintiffs have sustained similar injuries. *See, e.g., Janowsky v. Village of Waverly*, No. 83 Civ. 7345 (N.D.N.Y.1983) ($550,000 for 51 year old construction worker who suffered compression fracture at L1 and subsequently underwent a laminectomy), *aff'd without opinion*, 742 F.2d 1433 (2d Cir.1983). *Swanson v. Triborough Coach Corp.*, No. 16961/91 (Sup.Ct. Queens Co.1998) ($400,-000 for 48 year old hairdresser who suffered compression fracture at L2; peroneal neuropathy and bilateral peripheral neuropathy).

*Joseph Estevez*

34. Joseph was slightly over two years old at the time of the accident. As noted earlier, he was seated on his mother's lap and a seatbelt was wrapped around both of them. He is obviously too young to be responsible for any failure to mitigate damages by the proper use of a seatbelt.

A. *Past Medical Expenses and Pain and Suffering*

35. On the night of the accident, Joseph was taken to Jacobi Hospital. He was then transferred to the pediatric intensive care unit of Montefiore Medical Center, where he remained hospitalized for approximately five weeks. During that time he underwent the following surgical procedures: (1) exploratory laparotomy, bowel resection (removal of 8 cm. of the intestine), and repair of perforations in the bowel wall; and (2) aortic endartectomy (removing a clot from the artery), thrombectomy (removing a clot from the vein) and patch angioplasty. During this last procedure a Gortex patch was permanently placed on his aorta. The first surgery was due to a perforation of a section of the small intestine, an abdominal wall hernia and a tear or fracture of the lower pole of the right kidney. *See* Tr. at 8–9 (Dr. Spigland). The second surgery was due to an intimal tear, which is a tear to the inner lining of the aorta. *Id.* at 11–12; *see also* Government's Proposed Findings of Fact and Conclusion of Law ("G.FOF") at ¶ 46.

36. In August, 1997, Joseph was admitted to North Shore University Hospital. While there he underwent the following surgical procedures: exploratory laparotomy and small bowel resection (removal of an additional 8 cm. of the intestine). *Id.* at 23–25; *see also* G. FOF at ¶ 48.

37. Joseph was admitted to Montefiore Medical Center in January, 1998. During that hospitalization, he underwent a spinal fusion at his L2–L3 lumbar vertebrae. *Id.* at 25–26; *see also* G. FOF at ¶ 49. Dr. Spigland, a pediatric surgeon and the Government's expert witness, who was called as a witness by the plaintiff, testified that all of these injuries, hospitalizations and operations were directly caused by the accident. *Id.*

38. In addition to these surgical procedures, Joseph sustained the following injuries or underwent the following treatment: (1) he wore a special spinal fracture brace (a "TLSO" brace) for seven weeks for a compression fracture at L2–L3; (2) he was placed on high blood pressure medication as a result of renal injuries until May, 1997; (3) he was intubated with an endotracheal breathing tube for a brief period of time; (4) he was forced to utilize a nasogastric feeding tube for a brief period of time and (4) he has a foot drop (unable to flex his foot) in his right lower extremity. As a result of this last injury he has received physical therapy from the time of the accident to the present. *See generally* Testimony of Dr. Spigland Tr. 13–39; 191–194; *see also* Tr. at 335–41 (Zobeyda Estevez); G. FOF at ¶¶ 51–52.

39. The parties agree that Joseph has incurred $138,000 in past hospital and medical costs, the first $50,000 of which has been paid by "no-fault" insurance. The City of New York holds a lien in an approximate amount of $88,000 based on the Medicaid payments. *See* Government's Pretrial Memorandum of Law at 8; *see also* G. FOF at ¶¶ 61–63.

40. The Government suggests that the past pain and suffering award should be $300,000, and that Joseph be awarded past medical expenses in the amount of the lien, namely $88,000. *See* Government's Supplemental Memorandum of Law Concerning the Calculation of Damages ("G.Supp. Mem.") at 5. Plaintiff, in turn, argues for a past pain and suffering award of $500,000. Tr. at 1306.

41. The plaintiff's figures are sound and fully supported by the evidence. In addition, these figures are in general agreement with the past pain and suffering awards submitted by plaintiff's counsel. Thus, Joseph is awarded $88,000 for past medical expenses and $500,000 for past pain and suffering.

B. *Future Medical Expenses and Pain and Suffering*

42. With respect to future risks resulting from these injuries, Dr. Spigland testified that Joseph is at high risk for the development of intestinal adhesions, which

can lead to intestinal obstructions. Such adhesions can be painful and can be treated either through surgery or through the use of a nasogastric feeding tube and intravenous fluids. He is also at risk of suffering an infection of the Gortex patch or of developing pseudoaneurysms of the aorta. Finally, he will be at risk of developing an infection of the lining of the heart, known as endocarditis. Dr. Spigland believed this last risk was preventable through prophylactic treatment (antibiotics prior to any bloody procedure) and early diagnosis. *Id.* at 30–37.

43. The Government agrees, based on the testimony of its expert, Dr. Spigland, that Joseph will require an annual cardiology consultation and an annual echocardiogram. Because Joseph's life expectancy is 67.5 years, the Government concludes that he will have 13 annual examinations as a child (through age 17) and 55 annual examinations as an adult (through age 72). The cost of a cardiac consult for a child is $250 and for an adult is $330. The cost of an echocardiogram for a child is $850 and for an adult is $963. The total cost of these procedures is $85,415. *See* Plaintiff's Exhibit 51.

44. Joseph's treating physician, Dr. Leonard Seimon, testified that Joseph needs a scannergram and x-ray of his leg every 18 months during the next five years at a cost of approximately $350 per scan and $250 per office visit. *See* Tr. at 1034–35 (Dr. Seimon). This would result in additional expenses of $1,800.

45. There is some dispute over the future cost of treatment for the foot drop. There is little doubt that at a minimum Joseph would require an orthotic shoe insert. Each insert costs approximately $1,000. During his growing years, until age 16 or 12 more years, he would require a new orthotic each year, amounting to $12,000. During his remaining life span, ages 16–72, or 56 years, he would require a new orthotic every two years, amounting to $28,000. *See* Tr. at 297–99 (Dr. Charash); *see also* G. Supp. Mem. at Exhibit B.

Another possible treatment is continued physical therapy. There is testimony in the record that each session costs $75 and that Joseph has been receiving therapy three times a week, at a weekly cost of $225. The Government argues that he will only require therapy through the end of 1999 at a projected cost of $5,850. *Id.* Plaintiff, in turn, argues that Joseph will continue to need physical therapy for a longer period of time. *See* Tr. at 299–300 (Dr. Charash). At the rate of $75 per session times 3 sessions per week, the annual cost of physical therapy is $11,700. The final dispute is whether Joseph will need tendon lengthening surgery to treat his foot drop. There was no testimony in the record as to the cost for that surgery.

46. Joseph is entitled to an award for future medical expenses. Based on the totality of the evidence in the record, Joseph is awarded a total of $220,815 in future medical expenses. That award includes the following components: $85,415 for annual cardiology consultations and annual echocardiograms; $1,800 for scannergram's and leg x-rays during the next 5 years; $40,000 for orthotic devices; and $93,600 for physical therapy, assuming that Joseph will need 8 more years of physical therapy (*see* ¶ 45, *infra*). No amount is awarded for any tendon lengthening surgery as no cost estimate was provided for that *procedure*. An award might also be appropriate for surgery or hospitalization due to abdominal adhesions because Dr. Spigland testified that Joseph was at high risk for developing this condition. However, because there was no figure provided for either surgery or hospitalization, any award would be unduly speculative.

47. The Government concedes that Joseph is entitled to an award for future pain and suffering, but believes that Joseph is entitled to no more than $100,000 for the pain he will suffer during the remaining 67 years of his life. *See* G. Supp. Mem. at 4, 6. Plaintiff seeks a larger award for this category of damages.

48. A good deal of trial time and energy was expended on the issue of Joseph's prognosis. The Government's expert, Dr. Ira Abbott, testified that in his opinion Joseph's foot drop was due to a contracture in the plantax flexors resulting from weakness of the dorsiflexors. *See* Tr. at 1070; 1072 (Dr. Abbott). He further measured a leg shortening of approximately one half inch. *Id.* at 1124. He did not find any weakness of the quadricep, *id.* at 1104–06, and was unsure whether there is any permanent nerve damage. *Id.* at 1115. He concludes that Joseph's condition can be treated by attempting to stretch out the contracted muscle. He would accomplish this by means of a stretching program, or serial casting. *Id.* at 1086. If neither worked, he would recommend a surgery known as tendon lengthening. *Id.* at 1086–87. Assuming he could restore the mobility of the ankle joint through these procedures, he would then attempt to improve the muscle of the dorsiflexors by use a new procedure involving electrical stimulation. *Id.* at 1087–91. He would then provide a muscle strengthening program, requiring the attention of a physical therapist. *Id.* at 1091–93. With all of this he does not believe that the leg length discrepancy would increase, but rather that it would remain stable. *Id.* at 1093–94. He could not predict what the effects of growth would be on the long term prognosis. *Id.* at 1094. Dr. Abbott's program would require continued use of a brace and shoe inserts as well as physical therapy at most until age 12. *Id.* at 1134–37. He hoped that this program would fully eliminate the contracture which would then allow the dorsiflexors to be rehabilitated and eliminate the foot drop. *Id.* at 1104. Dr. Abbott conceded that his program is experimental and that he cannot predict the outcome for Joseph to a reasonable degree of medical certainty. *Id.* at 1089–90; 1100–02.

49. Plaintiff relied on the testimony of two doctors. His treating orthopedist, Dr. Leonard Seimon, testified that the foot drop is due to a weak dorsiflexor. *See* Tr. at 1024 (Dr. Seimon). The condition requires Joseph to wear a brace in order to alleviate the lack of dorsiflexion. *Id.* at 1027. Wearing the brace also reduces the degree of his limp. *Id.* at 1026. He believes that the condition is permanent as it is due to a neurological deficit caused by the accident. *Id.* at 1024. He testified that if the nerve hasn't recovered in two years, it is never going to change. *Id.* at 1025. The foot drop is responsible for the gait disorder. *Id.* at 1026. Both of these conditions are permanent. *Id.* He believes that a tendon lengthening might be required if the calf muscle tightens because then he would not be able to use a leg brace. *Id.* at 1027. He concedes that stretching might be effective in lieu of surgery. *Id.* at 1036. However, he does not believe that electrical stimulation will do any good at this late date. *Id.* at 1035–36.

50. Joseph's also called an expert witness, Dr. Leon Charash, who also found weak dorsiflexors, which result in a foot drop, leg shortening and a limp. *See* Tr. at 271–73 (Dr. Charash). He believes there is permanent nerve damage which is responsible for the weakness in the dorsiflexors. He concludes that Joseph's condition is due to a vascular insufficiency and that nothing more can be done to improve his foot drop. He did not find any contracture. *See generally id.* at 309–21. He opined that continued physical therapy and use of a brace are required to avoid any worsening in these conditions. *Id.* at 300.

51. I credit the testimony of both Dr. Seimon and Dr. Abbott. The real question, here, is whether Joseph's conditions are permanent. The doctors disagreed as to the cause of the injury, whether it was due to permanent nerve damage, or merely a contracture due to extended lack of use of the dorsiflexors of the right leg. If it was the former, the conditions are more likely to be permanent. But, even if is the latter, as urged by Dr. Abbott, I conclude

that the conditions are most likely permanent in nature. Dr. Abbott admitted that his conclusions were based on experimental programs and that he based them on a small sample which he had not studied over a lengthy period of time. In short, it is simply too early to know whether his protocol would result in a total cure. I conclude, based on the totality of the evidence, that Joseph's conditions of foot drop, leg length discrepancy and abnormal gait are permanent. I further conclude that he will benefit from continued physical therapy until he is fully grown, namely for an additional 12 to 16 years.

52. Joseph is entitled to an award for future pain and suffering. The setting of any such award is by definition speculative. A court must base its determination on comparable cases. *See generally Gretchen v. United States,* 618 F.2d 177 (2d Cir.1980) ($1.3 million; $1 million awarded for pain and suffering; $300,000 for lost earnings for injuries resulting in a permanent limp, decreased sensation in right arm and shoulder, and partial loss of urinary and sexual function); *Ramos v. Pasqua, Verdicts, Settlements & Tactics 9,* Vol. 8, No. 1 (Jan.1988) (14 year old boy awarded $1.05 million for a permanently shortened leg, chronic arthritis, chronic pain. Claimant had four surgeries and was scheduled for six more.); *Chapman v. Montefiore Hospital, Verdicts, Settlements & Tactics 375,* Vol. 10, No. 11 (Nov.1990) ($1.1 million for pain and suffering for injuries resulting in right foot drop, requiring claimant to wear a brace). I conclude based on my review of the evidence, and on cases submitted both by the plaintiff and the Government, that an appropriate award for future pain and suffering is $750,000. I reach this conclusion based on the totality of Joseph's medical problems and his long life expectancy. As noted earlier, Joseph's life expectancy is 67.5 years. This award, then, provides little more than $10,000 per year for a permanent limp and leg shortening, a damaged spine, potential abdominal adhesions, risk of infection of the Gortex patch, and the continued discomfort of medical monitoring and associated procedures.

C. *Future Lost Earnings*

53. Joseph requests an award for future lost earnings. He claims that as a person with a disability, his earning capacity is diminished compared to people who have no disability. He relies on the testimony of Andrew Gluck, who performed a vocational economic assessment. Mr. Gluck testified based on his observations of Joseph, his meeting with Joseph's mother, and his review of the medical records. Tr. at 529.

54. Mr. Gluck made several assumptions. First, he assumed that Joseph has a permanent non-severe disability. *Id.* at 532. Second, given the education of Joseph's parents, he assumed that Joseph is likely to obtain a college degree. *Id.* at 535–36. He next assumed, based on statistical tables made available by the United States Government, that disabled males with a college degree are statistically likely to earn $10,000 less per year than non-disabled males. More specifically, he testified that a non-disabled college graduate can expect to earn an annual salary of $64,610, whereas a disabled college graduate can only expect to earn an annual salary of $54,526. *Id.* at 536–37. Finally, he concluded that occupationally disabled people have a shorter work life expectancy than non-disabled people. He testified that on average occupationally disabled people work 6.67 years less than those who have no disability. *Id.* at 542.

55. Based on this evidence, Mr. Gluck concluded that over the course of his worklife, Joseph should be compensated for 31 years of working at an economic loss of $10,000 per year and for 6.67 years of an economic loss of approximately $54,500 per year. According to Mr. Gluck, the sum of these two figures is $920,689 in present value. *Id.* at 542–43.

56. The Government argues that Mr. Gluck's testimony should be rejected. It

first argues that there is no principled basis to assume that Joseph's disability is comparable to the disability suffered by those in the "non-severely disabled" category of the U.S. Government's statistics. The Government argues that Joseph's permanent disability, viewed in the light most favorable to the plaintiff, is a slight limp, resulting from the foot drop. How does Mr. Gluck, or the Court, conclude that this injury is comparable to those in the non-severely disabled category of the U.S. Government's statistics? The Government asserts that Mr. Gluck never established that this disability will actually constitute a limitation on Joseph's future employment. In short, the Government argues that there are differences in disabilities that were totally ignored by this expert.

57. The Government's second argument is that Mr. Gluck made certain assumptions concerning Joseph's future medical conditions that were based on his review of the medical records, in which he chose to accept certain medical opinions and reject others. For example, Mr. Gluck testified that "[t]here may be other problems due to internal injuries that would reduce his stamina, all kinds of things that might arise that might interfere with his ability to work." *Id.* at 531.

58. The Government's final attack on Mr. Gluck is that he relies strictly on statistical probabilities rather than on any specific information concerning Joseph. The Government made the following argument in its summation: "It's a question of not whether he has a limitation in his right leg, but whether that means he will be disabled, and no one has offered a definition of disability in the context of the individual representations that are included in one category versus another." *Id.* at 1203.

59. The Government's criticisms are well taken. I agree with the Government that there is no principled way to conclude that Joseph's earning power, given the credible assumption, that he will graduate college, will be any less than that of a healthy person who is a college graduate. Nonetheless, I disagree with the Government with respect to work life expectancy. Based on all of the evidence in the record, I conclude that Joseph has a less than average work life expectancy. I accept Mr. Gluck's testimony that a person with Joseph's complex of medical problems, which have been thoroughly described above at ¶¶ 34–51, is less likely to work as long or as continuously as a healthy person. According to Mr. Gluck's testimony a non-severely disabled person has a 6.67 year reduced work life expectancy based on reduced job opportunities, limitations on activities of daily living, continuous medical problems, and earlier retirement. Given the $64,610 average annual salary of a 45–year old college educated male, I conclude that Joseph is entitled to a future lost earnings award of $432,887 ($64,610 × 6.7 years).

60. Joseph is therefore entitled to a total award of $1,993,902. In accordance with § 5041(b) of Article 50–B, Joseph is to receive a lump-sum payment of $588,000 for the past damages, minus attorney's fees, and a lump-sum payment covering the first $250,000 of the future damages. After reduction for attorney's fees ($147,-000 or 25% of $588,000), Joseph is to receive a lump-sum payment of $441,000 for the past damages. The remaining future damages (after deduction of the $250,000 lump-sum and $62,500 (the 25% attorney's fee for Joseph's $250,000 future lump-sum)) is $1,093,402, which has a present value of $781,890.[2] As noted by Judge

---

2. After the reduction of the $250,000 lump-sum and $62,500 for the attorney's fee on that lump-sum, the remaining future damages ($1,093,402) are proportionately as follows: (1) $584,206 for future pain and suffering; (2) $172,002 for future medical expenses; and

(3) $337,194 for future lost earnings. Applying a 2% discount rate for a period of ten years, as requested by the Government, the present value of Joseph's future pain and suffering is $477,339. Using the Government's growth rate (6.21%) and discount rate (5%)

Sand in *Damiano v. Exide Corp.*, 970 F.Supp. 222, 224–9 & n. 9 (S.D.N.Y.1997), the rest of the calculations can be performed as follows: (1) take the present value of the damage award ($781,890) and set aside 25% ($195,473) for immediate payment to Joseph's attorney; (2) take the future value of the damage award ($1,093,402) and pay three-quarters ($820,052) to Joseph over time. *See Bryant v. New York City Health and Hosps. Co.*, 93 N.Y.2d 592, 716 N.E.2d 1084, 695 N.Y.S.2d 39 (1999). Thus, Joseph is to receive $820,052 over a ten (10) year period, plus the requisite 4% interest as set forth in § 5041(e).

61. Accordingly, Joseph's total award is reduced to approximately $1,511,052: a lump-sum payment of past damages totaling $441,000; a $250,000 lump-sum payment for future damages; and an annuity contract that will pay Joseph a total of $820,052 over ten years, plus the requisite 4% interest as set forth in § 5041(e). Thus, the annual payment for the first year is $82,005.20. The payment due in each succeeding year is computed by adding four (4) percent to each previous year's payment. Counsel is directed to deposit Joseph's share of the award either in the highest time deposit savings bank accounts available or to purchase a treasury bill for him which funds are not to be released until Joseph reaches the age of 18.

62. The total attorney's fee for future damages for Joseph is reduced to a lump-sum payment of $257,973 ($195,473 plus $62,500). In addition, the attorney's fee for past damages for Joseph is $147,000 (25% of Joseph's total past damages award of $588,000). Thus, the total attorney's fee for Joseph is $404,973, plus any reimbursement for actual and necessary expenses.

for medical services, the present value of Joseph's future medical services is $174,083. After applying the Government's requested discount rate of 2% for a period of 47 years (the sum of 31 years (Joseph's reduced work life expectancy according to Mr. Gluck) and

63. The total attorney's fees for all plaintiffs is as follows. (1) Zobeyda's fee is $3,750 (25% of $15,000); (2) Yaneira's fee is $23,750 (25% of $95,000); (3) Candida's fee is $6,250 (25% of $25,000); (4) Carmen's fee is $52,817 (25% of $211,266); and (5) Joseph's fee is $404,973 as itemized above at ¶ 62. In addition, counsel is to be reimbursed for all actual and necessary expenses.

64. The Clerk is directed to prepare a judgment and close this case.

18 years (the difference between his present age and age 22)), the present value of Joseph's lost earnings is $130,468. Thus, the total present value of the remaining damages is $781,890.